# Supreme Court of Wisconsin

| | |
|---|---|
| CASE NO.: | 2020AP1876-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin,<br>            Plaintiff-Respondent-Petitioner,<br>      v.<br>Tomas Jaymitchell Hoyle,<br>            Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 402 Wis. 2d 308, 974 N.W.2d 893
(2022 – unpublished)

| | |
|---|---|
| OPINION FILED: | March 31, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | December 13, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Chippewa |
| JUDGE: | James M. Isaacson |

JUSTICES:

ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. HAGEDORN, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Jennifer L. Vandermeuse,* assistant attorney general, with whom on the briefs was *Joshua L. Kaul,* attorney general. There was an oral argument by *Jennifer L. Vandermeuse,* assistant attorney general.

For the defendant-appellant, there was a brief filed by *Thomas B. Aquino,* assistant state public defender. There was an oral argument by *Thomas B. Aquino,* assistant state public defender.

**2023 WI 24**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP1876-CR
(L.C. No. 2015CF1159)

STATE OF WISCONSIN  :  IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent-Petitioner,**

 **v.**

**Tomas Jaymitchell Hoyle,**

    **Defendant-Appellant.**

**FILED**

**MAR 31, 2023**

Sheila T. Reiff
Clerk of Supreme Court

ZIEGLER, C.J., delivered the majority opinion of the Court, in which ROGGENSACK, REBECCA GRASSL BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. HAGEDORN, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY, J., joined.

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 ANNETTE KINGSLAND ZIEGLER, C.J. This is a review of an unpublished decision of the court of appeals, State v. Hoyle, No. 2020AP1876-CR, unpublished slip op. (Wis. Ct. App. Apr. 26, 2022), reversing the Chippewa County circuit court's[1] judgment of conviction against Tomas Jaymitchell Hoyle for two counts each of second-degree sexual assault and second-degree sexual assault

---

[1] The Honorable James M. Isaacson presided.

of a child, and also reversing the circuit court's order denying Hoyle's motion for postconviction relief.  We reverse.

¶2  Hoyle argues that he is entitled to a new trial because the prosecutor at Hoyle's trial violated his Fifth Amendment right against self-incrimination under Griffin v. California, 380 U.S. 609 (1965), by adversely commenting on his decision not to testify.  According to Hoyle, the prosecutor argued "that Hoyle should be convicted because the alleged victim's testimony was 'uncontroverted'" and that this was a comment on Hoyle's decision not to testify because "[o]nly Hoyle could have contradicted [the alleged victim's] sexual assault allegations."

¶3  We conclude that Hoyle is not entitled to postconviction relief.  The prosecutor at Hoyle's criminal trial did not violate Hoyle's Fifth Amendment rights under Griffin because the prosecutor did not comment on Hoyle's silence.  The prosecutor instead described the State's evidence as "uncontroverted" to remind the jury that they could evaluate only the evidence presented at trial and not speculate about other possible evidence.  Additionally, the jury likely would not have thought only Hoyle could have controverted the State's evidence because defense counsel explicitly identified other kinds of evidence not presented at trial.  In context, the prosecutor's remarks that the State's evidence was "uncontroverted" were neither "manifestly intended to be" nor "of such character that the jury would naturally and necessarily take [them] to be" adverse comments on Hoyle's silence.

_Morrison v. United States_, 6 F.2d 809, 811 (8th Cir. 1925).  The prosecutor therefore did not comment on Hoyle's silence, and the circuit court was correct to deny Hoyle's motion for postconviction relief.  We reverse the court of appeals.

I.  FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶4   On March 14, 2017, Hannah,[2] then a 15-year-old minor, disclosed to her school resource officer, Officer Joseph Nelson of the Chippewa Falls Police Department, that she was sexually assaulted in February 2017.  Officer Nelson emailed Investigator Kari Szotkowski, Chippewa County Sheriff's Department, that same day reporting the sexual assault.  Investigator Szotkowski interviewed Hannah at Hannah's school on March 15, during which Hannah reported her account of the sexual assault but did not say who assaulted her.  Hannah later disclosed to Officer Nelson in May 2017 that she was assaulted by Hoyle, who was a stepbrother to one of Hannah's friends and 20 years old at the time of the alleged assault.  Hoyle was subsequently arrested and charged with two counts each of second-degree sexual assault contrary to Wis. Stat. § 940.225(2) (2021-22)[3] and second-degree sexual assault of a child less than 16 years of age contrary to Wis. Stat. § 948.02(2).

¶5   The trial took place over two days in December, 2018.  According to pretrial filings, Hoyle did not plan to call any

---

[2] "Hannah" is a pseudonym used in place of the victim's name.  See Wis. Stat. (Rule) § 809.86(4).

[3] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

3

witnesses during trial. Prior to the start of Hoyle's trial while discussing motions in limine, the prosecutor asked the circuit court if he would be permitted to refer to the State's case as "uncontroverted" during his closing argument should Hoyle invoke his right not to testify. The prosecutor argued,

> So should the defendant not testify, I think the State is allowed to argue that the evidence is uncontroverted, meaning that you only have heard from [Hannah]. That's not commenting upon the defense's right to silence but commenting upon the evidence in front of the jurors at that time. I can't say it's uncontroverted because the defendant didn't testify, but I can say that her testimony is uncontroverted and that you haven't heard any testimony to the contrary.

The court granted the prosecutor's request over defense counsel's objection.

¶6 The State presented two witnesses at trial: Hannah and Investigator Szotkowski. Hannah testified that the day of the assault she "had taken some Vicodin and drank some alcohol" and that she "obviously was high" but "still had a sense of what was going on." Hoyle drove up to Hannah while she was walking to a friend's house and asked if she "wanted to hang out," to which Hannah agreed. Hannah said that Hoyle "kept poking [her] legs" during the drive. At one point, Hoyle drove down a dead-end road and stopped in the middle of the road. Hannah exited the car, and Hoyle "told [her] to get back into the car." Hannah got into the "back seat passenger side" because she "was scared" and "didn't want [Hoyle] touching [her] any more." Hoyle then climbed into the back seat, pulled down Hannah's pants and underwear, and sexually assaulted her. Hoyle drove

4

Hannah back home, dropped her off at "the bar across the street," and said to Hannah, "if anyone finds out about this, someone is going to end up dead."

¶7  Investigator Szotkowski testified that she determined the location of the sexual assault based on Hannah's description.  She otherwise had difficulty investigating because she "didn't know who the suspect was" at the time.

¶8  Hoyle exercised his right under the Fifth Amendment not to testify.  The defense did not present any other witnesses.

¶9  Before closing arguments, the court read instructions to the jury.  As relevant to this case, the court gave the following standard jury instructions:

> The burden of establishing every fact necessary to constitute guilt is upon the State.  Before you can return a verdict of guilty, the evidence must satisfy you beyond a reasonable doubt that the defendant is guilty.  If you can reconcile the evidence upon any reasonable hypothesis consistent with the defendant's innocence, you should do so and return a verdict of not guilty.  [Wis. JI——Criminal 140 (2019).]
>
> . . . .
>
> A reasonable doubt is not a doubt which is based upon mere guesswork or speculation. . . . While it is your duty to give the defendant the benefit of every reasonable doubt, you are not to search for doubt. You are to search for the truth.  [Id.]
>
> . . . .
>
> . . . [E]vidence is the sworn testimony of witnesses both on direct and cross-examination regardless of who called that witness. . . . [T]he evidence in this case to be considered is the

testimony of witnesses only.  [Wis. JI——Criminal 103 (2000).]

. . . .

. . . In weighing the evidence, you may take into account matters of your own common knowledge and your observations and experiences in the affairs of life. [Wis. JI——Criminal 195 (2000).]

. . . .

It is the duty of the jury to scrutinize and to weigh the testimony of witnesses and determine the effect of the evidence as a whole.  You are the sole judges of the credibility, that is, the believability of the witnesses and the weight to be given to their testimony.  In determining the credibility of each witness and the weight you give to the testimony of each witness, consider these factors:

Whether the witness has an interest or lack of interest in the result of the trial; the witness' conduct, appearance, and demeanor on the witness stand; the clearness or lack of clearness of the witness' recollections; the opportunity the witness had for observing and for knowing the matters about which she testified about; the reasonableness of the witness' testimony; the apparent intelligence of the witness; bias or prejudice, if any has been shown; possible motives for falsifying testimony, and all other facts and circumstances during a trial which tend either to support or to discredit the testimony. Then give to the testimony of each witness the weight you believe it should receive.  [Wis. JI——Criminal 300 (2000).]

. . . .

In this case the defendant has elected not to testify.  In a criminal case, he has the absolute constitutional right not to testify.  The defendant's decision not to testify must not be considered by you in any way and must not influence your verdict in any manner.  [Wis. JI——Criminal 315 (2001).]

¶10   The prosecutor began his closing argument immediately after the court finished reading the jury instructions.   He began by restating and emphasizing certain instructions:

> [Y]ou are to decide this case solely, solely on the evidence offered and received at the trial.  What that means is you're only to base it upon what you heard yesterday when the evidence was coming in at trial.  You're not to speculate about other things that may be out there.  You're not to think about other things.  You're to focus solely on the evidence that was presented to you yesterday in this trial.
>
> In fact, in order to reemphasize that, it's mentioned again in another instruction where it says, you are to consider only the evidence received during the trial.  Once again, not to consider anything else.  You're supposed to just focus on what you heard yesterday with the testimony.  [Hannah's] testimony that she gave here yesterday is uncontroverted.  You have heard no evidence disputing her account of that sexual assault.  You heard nothing. . . .  You heard her testify[, and] . . . [t]hat is what the testimony is.

The prosecutor summarized Hannah's testimony and described it as "uncontroverted" because "[t]here is absolutely no evidence disputing her account of what occurred."  He further explained that the jury could not "speculate":

> I can pretty much guarantee that the defense is going to get up here and say, what about this?  What about this in the investigation? What about that in the investigation?  Why didn't they do this?  Why didn't they do that?  Once again, the Judge instructed you, and you need to read that in the jury instructions, that you're not to base your decision, you're not to base doubt on guesswork or speculation.  In fact, the Judge instructed you, you are not to search for doubt. You are to search for the truth.
>
> You are not to sit there and say, what if I had this information, what if I had that information, what

7

if this was different, what if that was different? You're not to speculate. You're not to guess. You're to focus on what you heard yesterday, and what you heard yesterday was this young lady testifying about how she was assaulted by this defendant. . . .

. . . None of that was controverted, meaning it was all uncontroverted, meaning there was nothing controverting her statements about what had occurred . . . .

They will want you to speculate about what you could know, what they think you should have known, but it's not about speculation. It's about what you heard. In this case, because you only heard from [Hannah] about it, you didn't hear from any of her friends or anyone else testifying about it, it all comes down to her credibility.

He then argued that the jury should evaluate Hannah's testimony based on their "common experiences of life" and that Hannah was a credible witness based on her demeanor, lack of testimony establishing a motive to lie, and the clarity of her recollections. On rebuttal, the prosecutor told the jury,

You need to make the decision based upon the uncontroverted testimony of what she says occurred. They don't disagree it's uncontroverted. They just say you should ask for more. It's not my job to give you information I don't have. I'm not going to argue and say this is why you don't have it or that is why you don't have it. You don't have it. I will agree to that, you don't have that additional information, but the jury instruction says you are not to speculate about that.

¶11 The jury found Hoyle guilty on all counts. The court sentenced Hoyle to eight years of initial confinement and 10 years of extended supervision.

¶12 Hoyle filed a motion for postconviction relief on August 11, 2020, arguing, among other things, that he should

8

receive a new trial because "the [S]tate repeatedly stated in its closing argument that the evidence is 'uncontroverted'" in violation of Hoyle's right not to testify.[4] The circuit court orally denied Hoyle's motion during a hearing, concluding, "I don't think that was a comment on the defendant's failure to testify" because the prosecutor was arguing, "the only result that could be reached from what the testimony was, if you believed [Hannah], was that the defendant raped her." The circuit court later issued a written order denying Hoyle's motion for postconviction relief.

¶13 Hoyle appealed the circuit court's order, and the court of appeals reversed. The court of appeals concluded, "[T]he State's repeated argument that the evidence was 'uncontroverted' was improper under the circumstances of this case, where the only person who could controvert the alleged victim's testimony was Hoyle" and "thus violated Hoyle's Fifth Amendment right not to testify at trial." Hoyle, No. 2020AP1876-CR, ¶2.

¶14 The State petitioned this court for review, which we granted.

## II. STANDARD OF REVIEW

¶15 This case requires us to "determine whether a defendant's Fifth Amendment privilege against compulsory incrimination [has been] violated." State v. Ernst, 2005 WI

---

[4] Hoyle raised six additional bases for postconviction relief. None of these additional claims were raised before this court.

9

107, ¶11, 283 Wis. 2d 300, 699 N.W.2d 92. This involves "the application of constitutional principles to facts," which we review de novo as questions of law. State v. Spaeth, 2012 WI 95, ¶30, 343 Wis. 2d 220, 819 N.W.2d 769.

### III. ANALYSIS

¶16 We begin with an overview of United States Supreme Court cases developing the right against adverse comment on a defendant's decision not to testify. We then proceed by reviewing how the federal circuit courts of appeals and Wisconsin courts have applied the Supreme Court's precedent in the area of indirect comment on a defendant's silence. Finally, we analyze Hoyle's claim that the prosecutor violated his rights under Griffin by referring to the State's evidence as "uncontroverted" and conclude that the prosecutor did not comment on Hoyle's silence.

### A. Text And United States Supreme Court Cases

¶17 Under the Fifth Amendment to the United States Constitution, "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V; accord Malloy v. Hogan, 378 U.S. 1 (1964) (incorporating the Fifth Amendment against the states).

¶18 In Griffin, 380 U.S. 609, the United States Supreme Court interpreted the Fifth Amendment as providing a constitutional right for defendants to remain silent at trial without the jury drawing an adverse inference from that silence. The defendant in Griffin was on trial for first-degree murder and invoked his right not to testify. Id. at 609-10. The court

10

instructed the jury, "As to any evidence or facts against him which the defendant can reasonably be expected to deny or explain . . . if he does not testify . . . the jury may take that failure into consideration as tending to indicate the truth of such evidence . . . ." Id. at 610. The prosecutor acted accordingly in closing argument: "These things he has not seen fit to take the stand and deny or explain"; "[the victim] is dead, she can't tell you her side of the story. The defendant won't." Id. at 611.

¶19 The Supreme Court concluded both the court's and the prosecutor's actions were unconstitutional, holding the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Id. at 614. In reaching this conclusion, the Court first noted the federal statutory prohibition against drawing an adverse inference from a defendant's silence. Id. at 612-13. It then reasoned,

> If the words "fifth Amendment" are substituted for "act" and for "statute" [in Wilson, which held that adverse comment on silence was statutorily prohibited] the spirit of the Self-Incrimination Clause is reflected. For comment on the refusal to testify is a remnant of the "inquisitorial system of criminal justice," which the Fifth Amendment outlaws. It is a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly.

Id. at 614 (citation and footnote omitted).

¶20 The Court clarified the rule against adverse comment on a defendant's silence in Lakeside v. Oregon, 435 U.S. 333

11

(1978). There, the Court held a trial court could instruct a jury, over a defendant's objection, not to consider a defendant's silence. Id. at 338. Examining its decision in Griffin, the Court observed, "It is clear from even a cursory review of the facts and the square holding of the Griffin case that the Court was there concerned only with adverse comment," which is comment "that such silence is evidence of guilt." Id. at 338-39 (quoting Griffin, 380 U.S. at 615).

¶21 Accordingly, "[a]lthough Griffin can be read to prohibit any direct reference to a defendant's failure to testify," the Supreme Court "has declined to adopt such a broad reading of Griffin." United States v. Wing, 104 F.3d 986, 990 (7th Cir. 1997) (citing Lakeside, 435 U.S. 333). The Griffin rule is concerned only with adverse comment——that is, comment on "the evil to which Griffin addressed itself: the invitation to infer guilt from a defendant's decision not to take the stand." Id.

¶22 The case before us does not involve a direct comment on a defendant's silence but rather an alleged indirect comment. "[T]he Supreme Court has never clearly established that a prosecutor may not comment on the evidence in a way that indirectly refers to the defendant's silence." Edwards v.

12

Roper, 688 F.3d 449, 460 (8th Cir. 2012).  However, it has come close.[5]

¶23  In United States v. Hastings, 461 U.S. 499 (1983), a prosecutor stated during closing argument, "Let's look at the evidence the defendant[s] put on here for you so that we can put that in perspective.  I'm going to tell you what the defendant[s] did not do. . . .  The defendants at no time ever challenged any of the rapes . . . ."  Id. at 502.  Resolving the case on harmless error, the Court did not decide whether the prosecutor's remarks constituted adverse comments on the defendant's silence.  Id. at 509.  In a concurring opinion, Justice Stevens took the view that there was no constitutional error because, "[i]n reviewing the evidence adduced at the 5-day trial, the prosecutor identified the weaknesses in the defendants' presentations and invited inferences from the main focus of the evidence presented by the five defendants."  Id. at 514 (Stevens, J., concurring).  In other words, Justice Stevens explained that the prosecutor's comments were not improper because "the protective shield of the Fifth Amendment should

---

[5] The Supreme Court addressed a factual scenario similar to this case in Lockett v. Ohio, 438 U.S. 586 (1978).  In Lockett, the Court "quickly dismissed the argument that the prosecutor had violated the defendant's right to remain silent when he repeatedly remarked that the evidence was uncontradicted."  United States v. Robinson, 485 U.S. 25, 33 (1988) (citing Lockett, 438 U.S. 586).  However, the Court "did not need to decide whether such comment was generally improper, because in that case 'Lockett's own counsel had clearly focused the jury's attention on her silence.'"  Id. (quoting Lockett, 438 U.S. at 595).  Hoyle's trial counsel did not make any similar statement in this case.

13

[not] be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense case."[6]  Id. at 515 (Stevens, J., concurring).

¶24 Though these cases make clear that the Griffin rule prohibits adverse comment on a defendant's silence, the Supreme Court has not established a framework for deciding if a statement is a comment on a defendant's silence and whether such comment is adverse.

B.  Federal Circuit Courts Of Appeals And Wisconsin Cases

¶25 The prevailing standard among the federal circuit courts of appeals for determining whether a prosecutor violates the Fifth Amendment by adversely commenting on a defendant's silence first appeared in the Eighth Circuit's decision in Morrison, 6 F.2d 809.  Morrison did not analyze the Fifth Amendment but rather the federal statutory prohibition against adverse comment on a defendant's silence.  See id. at 811 (citing Act of March 16, 1878, ch. 37, 20 Stat. 30 (codified at 18 U.S.C. § 3481)).  The prosecutor made the following comments to the jury in closing argument:

---

[6] The Supreme Court later favorably cited Justice Stevens' Hastings concurrence in Robinson, 485 U.S. 25.  That case involved a prosecutor's comment on a defendant's silence in response to defense counsel's assertion that the government did not permit the defendant to explain his side of the story.  485 U.S. at 27-28.  The Court held that the prosecutor's comments did not violate the Fifth Amendment, explaining that in some cases "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel."  Id. at 32.

14

>    While you are the sole judges of the facts in the case, you would not be at liberty, of course, to arbitrarily disregard or reject testimony in the case, and <u>especially where it is not contradicted</u>, unless in the consideration of that testimony in some way you find it necessary in the performance of your duty to discredit or reject it. Then, of course, you should give it the weight and consideration you think it should receive at your hands.

<u>Id.</u> (emphasis added). The Eighth Circuit first concluded, "It is clear that this language contained no direct comment on the failure of accused to testify." <u>Id.</u> The court then considered whether it was an "indirect comment" using the following test: "Was the language used <u>manifestly intended</u> to be, or was it of such character that the jury would <u>naturally and necessarily</u> take it to be a comment on the failure of the accused to testify?" <u>Id.</u> (emphases added). Employing this test, the court concluded the prosecutor did not comment on the defendant's silence because "[t]estimony by the defendant was not the only method of contradicting the story told by the government's witnesses, if untrue." <u>Id.</u> The court also noted, "Comment by court and counsel that certain testimony is uncontradicted is common, oftentimes helpful, and very generally held to be without error." <u>Id.</u> (collecting sources).

¶26 Since the Eighth Circuit's decision in <u>Morrison</u>, every federal circuit court has applied a substantially similar version of this test in Fifth Amendment comment-on-silence

15

cases.[7] The Wisconsin Court of Appeals likewise has applied the _Morrison_ test. It first did so in _State v. Johnson_, 121 Wis. 2d 237, 358 N.W.2d 824 (Ct. App. 1984), where a pro se defendant delivered an opening statement to the jury but did not testify. _Id._ at 242. The prosecutor cautioned the jury that the defendant's "statements were not evidence and were not given under oath or subject to cross-examination." _Id._ The court of appeals cited the _Morrison_ formulation as the "test for determining whether remarks are directed to a defendant's failure to testify." _Id._ at 246 (quoting _Bontempo v. Fenton_, 692 F.2d 954, 959 (3d Cir. 1982)). The court concluded the prosecutor did not indirectly comment on the defendant's failure to testify, reasoning,

> While the prosecutor's remarks might have prompted the jury to recall and reflect upon [the defendant's] failure to testify, we do not conclude that the remarks _highlighted_ such a failure to testify. The remarks were directed at the manner in which the jury should consider the opening statement and did not address [the defendant's] failure to take the stand. . . . [T]hese remarks were not manifestly intended or of such a character that the jury would

---

[7] _See, e.g._, _Taylor v. Medeiros_, 983 F.3d 566, 576 (1st Cir. 2020); _United States v. Daugerdas_, 837 F.3d 212, 227 (2d Cir. 2016); _United States v. Savage_, 970 F.3d 217, 308 (3d Cir. 2020); _United States v. Rand_, 835 F.3d 451, 466 (4th Cir. 2016); _United States v. Perry_, 35 F.4th 293, 341 (5th Cir. 2022); _United States v. Gonzalez_, 512 F.3d 285, 292-93 (6th Cir. 2008); _United States v. Phillips_, 745 F.3d 829, 834 (7th Cir. 2014); _United States v. LaFontaine_, 847 F.3d 974, 979 (8th Cir. 2017); _United States v. Mikhel_, 889 F.3d 1003, 1060 (9th Cir. 2018); _United States v. Christy_, 916 F.3d 814, 830 (10th Cir. 2019); _United States v. Hano_, 922 F.3d 1272, 1295 (11th Cir. 2019); _United States v. Brown_, 508 F.3d 1066, 1071 (D.C. Cir. 2007).

16

naturally and necessarily take them to be a comment on the failure of the accused to testify.

Id. at 248.

¶27 The court of appeals later applied the Morrison test again in State v. Jaimes, 2006 WI App 93, 292 Wis. 2d 656, 715 N.W.2d 669. There, a prosecutor commented that other alleged collaborators were not "going to walk into court . . . and waive [their] Fifth Amendment rights . . . . My God, they have the same rights that [the defendant] does." Id., ¶22. The court of appeals, based on United States Supreme Court precedent, identified three factors which "must be present" to demonstrate a Griffin violation: "(1) the comment must constitute a reference to the defendant's failure to testify; (2) the comment must propose that the failure to testify demonstrates guilt; and (3) the comment must not be a fair response to a defense argument." Id., ¶21. The court first concluded under the Morrison test that this was a comment on the defendant's decision not to testify, but it nonetheless concluded the prosecutor's statement was not improper because it was not "adverse"——"the prosecutor did not state or intimate that [the defendant's] failure to testify indicated guilt."[8] Id., ¶23. Though it is possible that the jury could have interpreted the prosecutor's comment in an adverse manner, the court of appeals recognized that mere possibility is not enough: "[A] court

---

[8] The court of appeals also concluded that the prosecutor's comment was "a fair response to a defense argument" regarding why the alleged collaborators did not testify. State v. Jaimes, 2006 WI App 93, ¶24, 292 Wis. 2d 656, 715 N.W.2d 669.

17

should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." Id., ¶23 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974)).

¶28 Accordingly, the mere possibility that a jury could understand a prosecutor as adversely commenting on a defendant's silence does not demonstrate a violation of Griffin. See id. Rather, the prosecutor's language must have been "manifestly intended to be" or was "of such character that the jury would naturally and necessarily take it to be" an adverse comment on the defendant's silence for there to be a Griffin violation. Morrison, 6 F.2d at 811 (emphases added); see also Clark v. Lashbrook, 906 F.3d 660, 665 (7th Cir. 2018) (rejecting the argument that a prosecutor violated Griffin because it "assumes . . . that the prosecution's statement is only susceptible to one meaning"); United States v. Rand, 835 F.3d 451, 466 (4th Cir. 2016) (holding there was no Griffin violation because, though the jury could understand the prosecutor as commenting on the defendant's silence, this was not "the 'necessar[y]' conclusion the jury would draw"); United States v. LaFontaine, 847 F.3d 974, 980 (8th Cir. 2017) (emphasis added) (holding "the jury would not have necessarily understood the government's statement as an attempt to call attention to [the defendant's] failure to testify").

¶29 Based on the Supreme Court's precedent and the test from Morrison, unanimously adopted by all federal circuits and

18

applied by the Wisconsin Court of Appeals, we hold that three elements must be present for a prosecutor to violate Griffin: First, the prosecutor's language must have been "manifestly intended to be" or was "of such character that the jury would naturally and necessarily take it to be" a "comment on the failure of the [defendant] to testify." Morrison, 6 F.2d at 811; Griffin, 380 U.S. at 611. Second, the prosecutor's language must also have been "manifestly intended to be" or was "of such character that the jury would naturally and necessarily take it to be" "adverse," meaning comment "that such silence is evidence of guilt." Morrison, 6 F.2d at 811; Lakeside, 435 U.S. at 338-39 (quoting Griffin, 380 U.S. at 615); Donnelly, 416 U.S. at 647. Finally, the prosecutor's comments must not have been "a fair response to a claim made by defendant or his counsel." United States v. Robinson, 485 U.S. 25, 32 (1988).

C. Comments That Evidence Is "Uncontroverted."

¶30 Hoyle claims that the prosecutor in this case violated Griffin by repeatedly describing the State's evidence as "uncontroverted"[9] during closing argument. We conclude that the prosecutor's comments, taken in context, were not comments on Hoyle's silence and therefore did not violate Griffin. Because

---

[9] The prosecutor in this case used the term "uncontroverted" during his closing arguments. Though most cases have reviewed prosecutors' use of "uncontradicted" instead, the terms "'uncontradicted,' 'undenied,' 'unrebutted,' 'undisputed,' 'unchallenged,' [and] 'uncontroverted'" are often treated the same. United States v. McClellan, 165 F.3d 535, 548 (7th Cir. 1999).

19

we conclude that the prosecutor did not comment on Hoyle's silence, there is no need for us to analyze whether such comment was adverse or a fair response to a defense argument.

¶31 We first note that there is no per se rule that a prosecutor's description of evidence as "uncontroverted" is a comment on a defendant's silence. "Generally, it is not improper for the prosecuting attorney to remark that testimony for the prosecution is unexplained or uncontradicted, especially [as here] where the jury is instructed to disregard such comment as bearing on the accused's failure to testify." 23A C.J.S. Criminal Procedure & Rights of the Accused § 1762 (2022) (footnote omitted). It is notable that the Eighth Circuit in Morrison——the case that first announced the test for an indirect comment on a defendant's failure to testify——approved of a prosecutor's comment that testimony was "not contradicted." Morrison, 6 F.2d at 811. It reasoned that the "[t]estimony by the defendant was not the only method of contradicting the story told by the government's witnesses, if untrue," and noted, "[c]omment by court and counsel that certain testimony is uncontradicted is common, oftentimes helpful, and very generally held to be without error." Id. Similarly, we recognized in Bies v. State, 53 Wis. 2d 322, 48-49, 193 N.W.2d 47 (1972), "that it is proper for the district attorney to point out generally that no evidence has been introduced to show the innocence of the defendant." A prosecutor may refer to evidence as "uncontroverted" when the comment was neither "manifestly intended to be" nor was "of such character that the jury would

20

naturally and necessarily take it to be" a comment on the defendant's silence.  Morrison, 6 F.2d at 811.

¶32  Some courts have held that a prosecutor's statement that evidence is "uncontroverted" is a comment on a defendant's silence "if the only person who could have contradicted, denied, rebutted or disputed the government's evidence was the defendant himself."  United States v. Cotnam, 88 F.3d 487, 497 (7th Cir. 1996).  For example, the Seventh Circuit in Cotnam concluded that a prosecutor's description of testimony as "uncontroverted" was manifestly intended as a comment on the defendant's silence because the prosecutor focused attention on the defendant by asking a witness, "When these discussions were taking place between the defendant and yourself, did you keep the discussions basically to yourself or were other people around the house?"  Id. at 499.  Similarly, in United States v. Triplett, 195 F.3d 990 (8th Cir. 1999), the Eighth Circuit concluded a prosecutor's statement, "What you didn't hear was evidence that the defendant didn't possess the drugs," was a comment on the defendant's silence "because, according to the government's own theory of the case, no one other than Triplett himself could have testified about his possession of the drugs.  Triplett 'alone had the information to do so.'"  Id. at 995 (quoting Sidebottom v. Delo, 46 F.3d 744, 759 (8th Cir. 1995)).

¶33 Analyzing the prosecutor's remarks during Hoyle's trial in context reveals that his statements that the State's evidence was "uncontroverted" were neither "manifestly intended to be" nor "of such character that the jury would naturally and

21

necessarily take [them] to be" comments on the defendant's silence. <u>Morrison</u>, 6 F.2d at 811.

¶34 The main issue at Hoyle's trial was the credibility of the State's witnesses. Defense counsel began his opening statement by noting, "There is no burden on the defense to put witnesses up. There is no burden on the defense to provide testimony. The State has to provide you with every single thing that they're alleging." He told the jury, "you will not be given any scientific, physical, or medical evidence that connects Mr. Hoyle to [Hannah] whatsoever. You will not be given any corroborating witnesses in this case. . . . What that comes down to is you have to determine [Hannah's] credibility."

¶35 During the State's closing argument, the prosecutor anticipated defense counsel would argue reasonable doubt based on a lack of corroborating evidence and chose to lean on the jury instructions. The prosecutor made all statements that Hannah's testimony was "uncontroverted" in the context of explaining to the jury what evidence it was permitted to consider. The prosecutor reminded the jury, "the judge instructed you that you are to decide this case solely, solely on the evidence offered and received at the trial. . . . You're not to speculate about other things that may be out there." "You're supposed to just focus on what you heard yesterday with the testimony. [Hannah's] testimony that she gave here yesterday is uncontroverted." The prosecutor then recounted Hannah's testimony and said, "All of that is uncontroverted." He further explained, "There is absolutely no evidence disputing

22

her account of what occurred. I can pretty much guarantee that the defense is going to get up here and say, what about this? . . . You're not to speculate. You're not to guess. You're to focus on what you heard yesterday . . . ." One portion summarizes his argument particularly well:

> They will want you to speculate about what you could know, what they think you should have known, but it's not about speculation. It's about what you heard. In this case, because you only heard from [Hannah] about it, you didn't hear from any of her friends or anyone else testifying about it, it all comes down to her credibility.

¶36 This context makes clear that the prosecutor's description of Hannah's testimony as "uncontroverted" was entirely meant to focus the jury's attention on what evidence it was permitted to consider. The jury could consider only whether the evidence presented by the State was credible, and that evidence was "uncontroverted," meaning there was no contrary evidence for the jury to also evaluate. The jury could not "speculate" that there was some other evidence not presented that might exonerate Hoyle. They were to focus solely on whether the State's witnesses were credible. The prosecutor never argued that the lack of a defense case made the State's witnesses more credible. He instead walked through the court's instruction on credibility and told the jury to evaluate the testimony they heard based on their "own experiences in life"; "the victim's conduct, appearance, and demeanor"; "the clearness or lack of clearness of her recollection"; "[t]he reasonableness of her testimony"; "[t]he apparent intelligence of the witness";

23

and "possible motives for falsifying testimony." The prosecutor's description of the evidence as "uncontroverted" was, in context, comment on the evidence the jury was permitted to consider, not on Hoyle's silence.

¶37 It is also not the case that "the only person who could have contradicted, denied, rebutted or disputed the government's evidence was the defendant himself" and, therefore, the jury would have "naturally and necessarily" understood the prosecutor as commenting on Hoyle's silence. Cotnam, 88 F.3d at 497. It is possible that other evidence might exist that would controvert the State's witnesses. In fact, defense counsel identified several types of evidence that, if presented, might controvert them. Defense counsel told the jury: "We heard from the investigator yesterday. She did not go talk to [Hannah's] mother at all. That's important. . . . What was her demeanor when she came back?" "We heard that [Hannah] also lived with her stepfather and her two sisters." "[Hannah] tells us that she was going to go and see a friend. . . . That avenue is ignored." "We heard that the police never went to canvas the neighborhood." "We heard from [Hannah] that she was dropped off at this gas station or bar. The investigator says she had never went to those to find out if they had surveillance . . . ." "I think we all agree when two people engage in sex, their bodies are touching. There is going to be some sort of physical evidence . . . . We know that she didn't go through a medical

24

evaluation or physical evaluation." It is possible that some of this evidence could have controverted the State's witnesses.[10]

¶38 Read in context, the prosecutor described the evidence as "uncontroverted" in order to keep the jury from speculating about any other evidence, including the evidence defense counsel mentioned in his opening statement and closing argument, and to instead focus on whether the State's witnesses were credible. He argued that defense counsel was asking the jury to speculate about other evidence, which the jury could not do. Even if it is possible that the jury could have understood the prosecutor as commenting on Hoyle's decision not to testify, the jury would not have "necessarily" done so, and we "should not lightly infer" that the jury would have drawn the "most damaging meaning" from the prosecutor's statements.[11] Jaimes, 292 Wis. 2d 656, ¶23 (quoting Donnelly, 416 U.S. at 647).

---

[10] We consider defense counsel's argument in this case only because it provides context as to how the jury would understand the prosecutor's argument, not because the prosecutor's argument was a "fair response to a defense argument." Jaimes, 292 Wis. 2d 656, ¶21.

[11] Assuming arguendo that the jury would have naturally and necessarily understood the prosecutor to be commenting on Hoyle's silence, there would still be no error. The argument was never adverse because the prosecutor never asked or intimated that the jury should interpret Hoyle's silence as an admission of guilt. Had the prosecutor commented on Hoyle's silence——which he did not——such comment only directed the jury away from speculation regarding the evidence they did not hear and toward the evidence they did hear. Any mere possibility that the jury could instead have made the prohibited inference is insufficient.

25

¶39 We therefore conclude the prosecutor did not violate Griffin because, taking the prosecutor's remarks in context, the description of the State's evidence as "uncontroverted" was neither "manifestly intended to be" nor "of such character that the jury would naturally and necessarily take [them] to be" a comment on Hoyle's silence. Morrison, 6 F.2d at 811. Because we conclude the prosecutor did not comment at all on Hoyle's silence, it is unnecessary for us to analyze whether such comment "propose[d] that the failure to testify demonstrates guilt" or whether it was a "fair response to a defense argument." Jaimes, 292 Wis. 2d 656, ¶21.

¶40 Because we conclude the prosecution's description of the evidence as "uncontroverted" was not an error under Griffin, there is no need for us to engage in a harmless error analysis. See Chapman v. California, 386 U.S. 18, 22 (1967).

## IV. CONCLUSION

¶41 Hoyle argues that he is entitled to a new trial because the prosecutor at Hoyle's trial violated his Fifth Amendment right against self-incrimination under Griffin by adversely commenting on his decision not to testify. According to Hoyle, the prosecutor argued "that Hoyle should be convicted because the alleged victim's testimony was 'uncontroverted'" and that this was a comment on Hoyle's decision not to testify because "[o]nly Hoyle could have contradicted [the alleged victim's] sexual assault allegations."

¶42 We conclude that Hoyle is not entitled to postconviction relief. The prosecutor at Hoyle's criminal trial

26

did not violate his Fifth Amendment rights under Griffin because the prosecutor did not comment on Hoyle's silence. The prosecutor instead described the State's evidence as "uncontroverted" to remind the jury that they could evaluate only the evidence presented at trial and not speculate about other possible evidence. Additionally, the jury likely would not have thought only Hoyle could have controverted the State's evidence because defense counsel explicitly identified other kinds of evidence not presented at trial. In context, the prosecutor's remarks that the State's evidence was "uncontroverted" were neither "manifestly intended to be" nor "of such character that the jury would naturally and necessarily take [them] to be" adverse comments on Hoyle's silence. Morrison, 6 F.2d at 811. The prosecutor therefore did not comment on Hoyle's silence, and the circuit court was correct to deny Hoyle's motion for postconviction relief. We reverse the court of appeals.

*By the Court.*—The decision of the court of appeals is reversed.

27

¶43 BRIAN HAGEDORN, J. *(concurring).* The Fifth Amendment to the United States Constitution provides, "No person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In Griffin v. California, the United States Supreme Court arguably went beyond the original meaning of this clause and held that it forbids "comment by the prosecution on the accused's silence." 380 U.S. 609, 615 (1965). Hoyle's claim before us is premised on the Fifth Amendment alone; no argument is made under the Wisconsin Constitution. We are therefore duty-bound to apply the precedent of the United States Supreme Court. The majority opinion does so, and I join it.

¶44 I write separately, however, to discuss the original meaning of the Self-Incrimination Clause of the Fifth Amendment, and to consider how that meaning might inform our approach in cases such as this. The short story is that the right to not accuse oneself was widely understood to be one of our natural, God-given, inalienable rights. And our founders were cognizant of the historical abuse of this right during the Inquisition and later by ecclesiastical and English prerogative courts. Little to nothing in the historical record suggests that this right protected those accused of crimes——who were not even allowed to testify in their own defense at the time——against comments on and adverse inferences from their decision not to testify.

¶45 So how did Griffin arise? In brief, criminal trials in America evolved to give those accused of crimes the statutory right to testify. And as jurisdictions moved in this direction,

1

some states and the federal government enacted laws that protected defendants against adverse inferences from the decision not to testify——although this policy choice was not universal. Soon enough, a body of cases interpreting and applying these principles arose, yielding Griffin-type rules rooted in both statute and common law. As we shall see, Griffin then incorporated this body of law at least in part and rooted it in the Fifth Amendment.

¶46 This history reveals, at the very least, strong arguments that Griffin and its progeny go beyond the original meaning of the Self-Incrimination Clause of the Fifth Amendment. Given this, how should courts that must apply Griffin respond when faced with cases asking us to extend precedent that has a weak foundation in the original meaning of the Constitution? In my view, we should tread cautiously. Where possible, we should aim to "resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history." Free Enter. Fund v. Public Co. Acct. Oversight Bd., 537 F.3d 667, 698 (D.C. Cir. 2008) (Kavanaugh, J., dissenting). Being mindful of the text and history of the Fifth Amendment provides further support to the majority's decision not to extend Griffin to the facts of the case before us. For these reasons, I join the majority opinion and respectfully concur.

2

## I. GRIFFIN & THE SELF-INCRIMINATION CLAUSE

### A. Nemo Tenetur & the Ex Officio Oath

¶47 In the twelfth century, Bolognese monk Gratian authored the Decretum——a compilation of the body of Catholic rules and pronouncements that had circulated in collections of "canons." J.H. Baker, An Introduction to English Legal History 110 (2d ed. 1979). The Decretum systematized these canons "in accordance with a hierarchical scheme of authority with the pope at the earthly summit." Id. Study of "Canon law became all the rage" as European universities picked it up, and a new system of courts applying these canons——known as ecclesiastical courts—— soon developed. Id.

¶48 We begin the story of the Fifth Amendment's Self-Incrimination Clause here because one of the enduring maxims recognized in canon law was known in Latin as nemo tenetur prodere seipsum——that is, "No one is bound to betray oneself." Richard H. Helmholz, Origins of the Privilege against Self-Incrimination: The Role of the European Ius Commune, 65 N.Y.U. L. Rev. 962, 962 (1990). The maxim's origins are a bit of a mystery, but by the Middle Ages it was widely referenced and widely accepted.[1] Leonard W. Levy, Origins of the Fifth

---

[1] A prominent fourth-century Church Father, St. John Chrysostom, referenced the idea when discussing St. Paul's letter to the Hebrews. Richard H. Helmholz, Origins of the Privilege against Self-Incrimination: The Role of the European Ius Commune, 65 N.Y.U. L. Rev. 962, 982 (1990). St. Augustine did as well around the same time. Leonard W. Levy, Origins of the Fifth Amendment and its Critics, 19 Cardozo L. Rev. 821, 831 (1997) [hereinafter Levy, Critics]. The maxim made more concrete appearances as a legal concept during the Middle Ages, first in Gratian's Decretum (twelfth century) and then in the

Amendment and its Critics, 19 Cardozo L. Rev. 821, 831 (1997). The theological driver behind this principle was that "men and women should confess their sins to God, but they should not be compelled to make their crimes known to anyone else." Helmholz, supra at 982. Eventually, the maxim would mean much more as government power was seen as transgressing its command.

¶49 That brings us to the Inquisition——a period during early medieval times in which the Catholic Church sought to protect itself from widespread heresy. Leonard W. Levy, Origins of the Fifth Amendment 20-21 (Oxford University Press 1968) [hereinafter Levy, Origins]. While the ancient maxim against self-betrayal was accepted as such, it had its limits. St. Thomas Aquinas reflected and reinforced the thinking at the time that in order to protect the theological purity of the church, "truthful answers to incriminating questions" must be demanded, and those embracing heresy should be put to death. Id. at 21. Even torture was an authorized tool to root out heresy. Id.

¶50 In 1215, Pope Innocent III remodeled the criminal procedures of canon law, permitting three modes of prosecution. Id. at 22. The first was accusatio——accusation from a private person. Id. This mode came with a catch; it exposed the accuser to punishment if his prosecution failed. Id. The second was denunciatio——a private accusation allowing "the private accuser to avoid the danger and burden of accusatio." Id. at 22-23. In denunciatio the judge proceeded "ex officio"——

---

glossa ordinaria to the Decretals of Pope Gregory IX (thirteenth century). Helmholz, supra at 967; Levy, Critics, supra at 831.

4

"by virtue of his office"——and became a party to the suit, conducting the prosecution for the secret accuser. Id. at 23. The third was inquisitio——a mode "by which the judge combined in his person all roles." Id. He sat as accuser, prosecutor, judge, and jury. Id.

¶51 The common procedure employed by ecclesiastical courts, by which they implemented these types of prosecution, was the oath de veritate dicenda. Id. This oath required a party to swear to tell the truth to all questions that might be asked. Id. The oath, however, could become an "an inescapable trap" because an accused had to either take the oath (and risk being condemned for perjury if the court didn't believe the answers) or be condemned as guilty for refusing to answer. Id. at 23-24. As such, it operated in all respects as a self-incriminatory oath. Id. at 24. And because the oath took place during inquisitorial procedures in which the judge operated ex officio, the oath became known as the ex officio oath. Id.

¶52 By the early fourteenth century, English monarchs had created the king's council, a political body made up of the most powerful state officers, nobles, bishops, and judges. Id. at 49. This council eventually "developed into the House of Lords and the central courts of the common law"——"the Court of Common Pleas (civil) and the Court of King's Bench (criminal)." Id. But it also spun off what were called conciliar or prerogative courts, supplementing the general jurisdiction of the other courts at the time. Baker, supra at 101. The original justification for the creation of these courts "was that

5

extraordinary action by the king and his magnates offered the only escape from the kind of undue influence which could corrupt sheriffs and juries." Id.

¶53 Because many of the chancellors serving on the king's council were assisted by bishops and doctors of canon law, its procedures largely emulated those used in the ecclesiastical courts. Levy, Origins, supra at 50. For example, they had no juries. Id. The common criminal procedure involved secret accusations by informers (called an "information" or "suggestion") instead of the typical grand jury process of the common law. Id. After the court commanded attendance of a person through a writ of citation, it would require them to take the ex officio oath. Id. "The defendant was required to swear the oath and then was confronted with a series of interrogatories which were based on the information obtained by suggestions and the examination of witnesses." Id. at 51. "Any discrepancies or contradictions in his answers were used against him in an effort to break him down and force a confession of guilt." Id.

¶54 The prerogative courts changed dramatically during the Elizabethan (1558-1603) and early Stuart (1603-1640s) periods. John H. Langbein, The Historical Origins of the Privilege Against Self-Incrimination at Common Law, 92 Mich. L. Rev. 1047, 1073 (1994). As those monarchies began imposing Anglican forms of worship on the British people, they enlarged the jurisdiction of the prerogative courts to "suppress religious and political heterodoxy." United States v. Gecas, 120 F.3d 1419, 1436 (11th

6

Cir. 1997). The oath became "especially problematic for religious dissenters, as they were 'typically guilty of the nonconformist religious practices for which they were being investigated.'" In re Flint Water Cases, 53 F.4th 176, 214 (6th Cir. 2022) (Thapar, J., concurring in part) (quoting another source). "Anyone who refused this 'inquisitional oath' could be held in contempt, imprisoned, and even tortured." Id. (quoting another source); Langbein, supra at 1073.

¶55 So, by the sixteenth and seventeenth centuries, both the prerogative courts and ecclesiastical courts used the ex officio oath to impose their political and religious will upon the people. Many pushed back and resented what they saw as a grand abuse of power. Levy, Origins, supra at 268-69. The ex officio oath, they argued, violated the laws of God, drawing upon the ancient principle that no one should be forced to accuse oneself.[2] Helmholz, supra at 967-68.

¶56 In 1637, tensions boiled over. Levy, Origins, supra at 271-72. That year, the Star Chamber, probably the most well-known of the prerogative courts, brought charges against English activist John Lilburne for shipping seditious books into England from Holland (among other charges). Id. at 273. The Star Chamber found him guilty of contempt for refusing to take the oath. Lilburne's Case, 3 How. St. Tr. 1315 (Star Chamber 1637). He condemned the oath as "against the law of God; for that law

---

[2] In addition to the nemo tenetur maxim, some historians also point to the "rights of conscience" as an additional basis for rejecting forced self-accusations. Levy, Critics, supra at 836.

7

requires no man to accuse himself." Levy, Origins, supra at 277. Lilburne's trial was likely the final nail in the coffin for England's prerogative courts. Reflecting popular objections, Parliament abolished the Star Chamber in 1641, and forbade use of the ex officio oath procedure in the English ecclesiastical courts. Langbein, supra at 1073-74.

B. Impact on Founders & Ratification of Fifth Amendment

¶57 The experience of our English forebears in their fight against the inquisition-style persecutions had a profound effect on the founders. In 1735, a Presbyterian special commission in Philadelphia investigated the unorthodox beliefs of local minister Samuel Hemphill because of his deistic ideas. Levy, Origins, supra at 382-83. Hemphill reportedly refused a demand to give the commission his sermons because it was "contrary to the common Rights of Mankind, no Man being obligated to furnish Matter of Accusation against himself." Id. at 383. The commission took his refusal as a "virtual confession of guilt," and suspended him for "Unsound and Dangerous" beliefs. Id. But a young Benjamin Franklin came to Hemphill's defense, writing that the commission resembled "that hellish Tribunal the Inquisition." Id.

¶58 In 1788, during the debate in Massachusetts over ratifying the newly proposed federal Constitution, one delegate objected to the charter because nothing prevented "Congress from passing laws which shall compel a man, who is accused or suspected of a crime, to furnish evidence against himself."

Remarks by Abraham Holmes in the Massachusetts Debates, in 2 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 111 (Jonathan Elliot ed., 1836). He warned that the Constitution as proposed gave Congress the power to create judicial bodies resembling "that diabolical institution, the Inquisition." Id.

¶59 This widespread acceptance of the ancient right to not accuse oneself was reflected in the first constitutions in the new American states. Virginia led the way, establishing that no one may "be compelled to give evidence against himself." Virginia Declaration of Rights § 8 (1776). Seven other states included similar provisions, granting rights against compulsion "to give evidence" or "to furnish evidence" against oneself. United States v. Hubbell, 530 U.S. 27, 52 (2000) (Thomas, J., concurring); Flint Water Cases, 53 F.4th at 215 (Thapar, J., concurring).

¶60 And when James Madison drafted the Fifth Amendment to the United States Constitution, he used language similar to that in state constitutions and wrote, "No person . . . shall be compelled in any criminal case to be a witness against himself."[3] Hubbell, 530 U.S. at 53 (Thomas, J., concurring); U.S. Const. amend. V. Historians generally believe Madison's use of the phrase "to be a witness" was synonymous with the "giving" or

---

[3] The Wisconsin Constitution uses substantially the same language. See Wis. Const. art. I, § 8(1) ("No person . . . may be compelled in any criminal case to be a witness against himself or herself.").

"furnishing" of evidence as phrased in many state constitutions. Hubbell, 530 U.S. at 53 (Thomas, J., concurring).

¶61 In sum, although scholars debate the precise weight different historical practices may have had in forming their convictions, the general consensus is that the people who adopted our Constitution had in mind the inquisitorial practices of the ecclesiastical and prerogative courts along with their forerunners. Ullmann v. United States, 350 U.S 422, 446 (1956) (Douglas, J., dissenting); Flint Water Cases, 53 F.4th at 215 (Thapar, J., concurring in part); Sharon R. Gromer, Fifth Amendment——The Right to a no "Adverse Inference" Jury Instruction, 72 J. Crim. L. & Criminology 1307, 1307-08 (1981). Moreover, they believed that this kind of violation of the basic rights of mankind should be protected against, and did so in their constitutions.

¶62 The text of the Self-Incrimination Clause of the Fifth Amendment, therefore, invokes the pre-existing God-given right of all persons to not be compelled to be a witness against themselves. The word "compelled" at the time the amendment was ratified meant forced or constrained. Compelled, New and Complete Dictionary of the English Language (Edward & Charles Dilly, eds. 1775). And the amendment gives this protection to all persons "in any criminal case." U.S. Const. amend. V. The text of the amendment does not say anything about what a jury might permissibly infer from a failure to testify, or whether attorneys may comment upon the failure to testify. And as the next part of the story reveals, our founders would not have had

10

the testimony of criminal defendants in mind when enshrining the right against self-incrimination in the Constitution.

### C. The Common Law Rule of Disqualification

¶63 During the Founding Era, common law rules disqualified criminal defendants from testifying under oath in their own trials. Ferguson v. Georgia, 365 U.S. 570, 573-74 (1961). While this may seem foreign to us today, the central justification for this rule at the time was that a party to a case could not be trusted. Id. at 573. The theory was that the witness stand should be open only to "those presumably honest, appreciating the sanctity of an oath, unaffected as a party by the result, and free from any of the temptations of interest." Benson v. United States, 146 U.S. 325, 336 (1892).

¶64 To be sure, defendants still often spoke at trial. But they did so pro se in their own defense since legal representation for the accused was uncommon (and in earlier times, not even permitted). John Henry Wigmore, Treatise on the System of Evidence in Trials at Common Law: Including the Statutes and Judicial Decisions of All Jurisdictions of the United States 697 (1904). Thus, defendants often had to argue their own case and on occasion give their account of what happened. Id. But their unsworn statements were not considered testimony, and therefore were not viewed as evidence for the jury to consider. Id.

¶65 Moreover, the historical record supports the notion that juries could draw adverse inferences from a defendant's

11

silence even though his statements weren't technically evidence. <u>Mitchell v. United States</u>, 526 U.S. 314, 333-34 (1999) (Scalia, J., dissenting). If a defendant did not defend himself, the assumption was "that could only be because he was unable to deny the truth of the evidence." <u>Id.</u> at 334 (quoting J. Beattie, <u>Crime and the Courts in England: 1660-1800</u> 348-349 (1986)). Fact finders "did not hesitate to draw inferences of guilt when defendants remained silent." Albert W. Alschuler, <u>A Peculiar Privilege in Historical Perspective: The Right to Remain Silent</u>, 94 Mich. L. Rev. 2625, 2631 (1996).

¶66 Some evidence also suggests that a defendant's silence was directly commented upon. A typical process was that a magistrate would examine a defendant pre-trial, getting the defendant's story.[4] And while the defendant was unable to testify himself, the magistrate could and would report the defendant's answers to the jury as testimonial evidence. John H. Langbein, The Privilege and Common Law Criminal Procedure: the Sixteenth to the Eighteenth Centuries, in <u>The Privilege Against Self-Incrimination: Its Origins and Development</u> 92 (1997). If a defendant refused to answer the magistrate's questions, the magistrate would report as much to the jury. <u>Id.</u> Therefore, in this way, a defendant's decision not to answer questions would be commented on to the jury, with negative inferences from that front and center.

---

[4] This process was dictated by the Marian Committal Statute. John H. Langbein, The Privilege and Common Law Criminal Procedure: The Sixteenth to the Eighteenth Centuries, in <u>The Privilege Against Self-Incrimination: Its Origins and Development</u> 91-92 (1997).

¶67 When the Fifth Amendment was adopted, the rule disqualifying parties from testifying——including criminal defendants——was ubiquitous. Ferguson, 365 U.S. at 574; Richard A. Nagareda, Reconceiving the Right to Present Witnesses, 97 Mich. L. Rev. 1063, 1113 (1999). Thus, the historical record strongly weighs against any notion that the Fifth Amendment at the time of its adoption was meant to prohibit comment upon or adverse inferences regarding the failure of a criminal defendant to testify in his trial——because that kind of testimony did not happen, and comment upon and inferences from a defendant's refusal to defend himself was commonplace.

D. Abolition of the Common Law Rule of Disqualification

¶68 This approach to criminal prosecutions, however, did not hold. By the turn of the nineteenth century, some dissenters began to voice concern with the status quo. John Fabian Witt, Making the Fifth: The Constitutionalization of American Self-Incrimination Doctrine, 1791-1903, 77 Tex. L. Rev. 825, 864 (1999). In 1805, a passionate Philadelphian circulated a pamphlet calling the practice of disqualifying parties from testifying (including criminal defendants) the "prodigious evil of our jurisprudence." Id. Serious public debate about these rules began to take place in the 1830s, starting in England. Id.; Ferguson, 365 U.S. at 575. Englishman Jeremy Bentham assailed the practice of excluding a party from testifying because, he argued, it effectively excluded truth. Witt, supra at 863-64. He insisted that evidence "is the basis of justice;

13

exclude evidence, you exclude justice." Id. (quoting 5 Jeremy Bentham, Rationale of Judicial Evidence 1 (London, Hunt & Clarke 1827)). Bentham's arguments caught on across the Atlantic, with American contemporaries similarly maintaining that exclusion of relevant witnesses "obstructed the 'discovery of the truth.'" Id. at 865 (quoting another source); id. at 864 n. 147 (collecting sources).

¶69 By the dawn of the Civil War, the stage was set for change. Maine led the way in 1859 by permitting defendants to testify in some circumstances. Ferguson, 365 U.S. at 577. When the Fourteenth Amendment was ratified in 1868, nine states had followed suit.[5] Mitchell, 526 U.S at 335-36 (Scalia, J., dissenting). In 1869, Wisconsin joined in and qualified defendants for all trials. § 1, ch. 72, Laws of 1869. And the federal government passed its own qualification statute in 1878. See 18 U.S.C. § 3481. By the end of the nineteenth century,

---

[5] The United States Supreme Court has interpreted the Fourteenth Amendment as rendering the Fifth Amendment applicable against the states. Malloy v. Hogan, 378 U.S. 1, 10-11 (1964). Thus, some scholars believe that the period surrounding the adoption of the Fourteenth Amendment should also be examined when a state action is challenged. See, e.g., New York State Rifle & Pistol Assoc., Inc. v. Bruen, 142 S. Ct. 2111, 2138 (2022) (describing the debate). Here, the evidence from either time period cuts the same way. By the time Congress adopted the Fourteenth Amendment in 1868, only nine states qualified defendants to testify. Mitchell v. United States, 526 U.S. 314, 335-36 & n.1 (1999) (Scalia, J., dissenting). Of those nine, six prohibited adverse inferences while three didn't. Id. at 335-36. Thus, since so few states prohibited adverse inferences in 1868, it cannot "reasonably be argued that the new statutes somehow created a 'revised' understanding of the Fifth Amendment that was incorporated into . . . the Fourteenth Amendment." Id. at 335.

14

nearly every state made provision for criminal defendants to testify in their own defense. See Ferguson, 365 U.S. at 577 & n.6.

¶70 This change naturally led to new policy debates. If a defendant could testify, how should prosecutors and juries be permitted to characterize this decision? Id. at 579-80; Gromer, supra at 1308. The answer was not uniform. But many jurisdictions enacted laws along the lines of that adopted by the federal government in 1878, which provided that a defendant's "failure to [testify] shall not create any presumption against him." 18 U.S.C. § 3481.

¶71 In 1893, the United States Supreme Court was asked whether a prosecutor's reference to a defendant's failure to testify violated the no-presumption proscription in 18 U.S.C. § 3481. In Wilson v. United States, the Court said yes. 149 U.S. 60, 66-67 (1893). It reasoned that the prosecutor's comment induced the jury "to disregard entirely the presumption of innocence to which by the law he was entitled." Id. at 66. The thinking reflected in Wilson——rooted in a mix of statutory and common law——began to proliferate around the country and embed itself into American law over the next half century. See J. Evans, Comment or Argument by Court or Counsel that Prosecution Evidence is Uncontradicted as Amounting to Improper Reference to Accused's Failure to Testify, 14 A.L.R.3d 723 (originally published in 1967) (collecting pre-Griffin cases).

¶72 With time, courts built out analytical frameworks for how to analyze whether a prosecutor actually commented on a

15

defendant's failure to testify. The most well-known and oft-cited of these cases is the Eighth Circuit's opinion in <u>Morrison v. United States</u>, which is discussed extensively in the court's opinion today. 6 F.2d 809 (8th Cir. 1925). In <u>Morrison</u>, the court was asked to interpret and apply the same federal law interpreted in <u>Wilson</u> (18 U.S.C. § 3481). <u>Id.</u> at 811. The Eighth Circuit framed the following test for analyzing whether a prosecutor crossed over the line: whether "the language used manifestly intended to be, or was it of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify?" <u>Id.</u>

¶73 It is important to emphasize that even well into the twentieth century, however, not every jurisdiction adopted this approach or even forbade comments on an accused's silence. For example, in 1934, California adopted a constitutional provision that made entirely the opposite policy choice:

> No person shall . . . be compelled in any criminal case, to be a witness against himself; nor be deprived of life, liberty, or property without due process of law; but in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury.

Cal. Const. art. I, § 13 (1938); <u>see</u> 1934 Enacted Proposition 5 (amending Art. I, § 13 of the California Constitution).

¶74 Therefore, before the United States Supreme Court's decision in <u>Griffin</u> in 1965, most jurisdictions, including the federal government, had a legal framework rooted in statutes and cases that protected defendants from comments upon or adverse

16

inferences based on a criminal defendant's decision not to testify. But this was not a universally shared approach.

## D. Griffin & Its Aftermath

¶75 After initially rejecting the incorporation of the Self-Incrimination Clause via the Fourteenth Amendment in 1908,[6] the Supreme Court reversed course in 1964.[7] That paved the way for Griffin, decided the very next year. In Griffin, the State of California tried the defendant for first degree murder. 380 U.S. at 609. When the trial court instructed the jury on the issue of guilt, it told them that they could infer guilt from the defendant's failure to testify. Id. at 609-10. The prosecutor made hay, telling the jury that the defendant "has not seen fit to take the stand and deny or explain." Id. at 611. The jury convicted the defendant and he appealed. Id.

¶76 The United States Supreme Court acknowledged that the Wilson decision——which forbade comment by the prosecution on a defendant's failure to take the stand——"rested not on the Fifth Amendment, but on an Act of Congress, now 18 U.S.C. [§] 3481." Id. at 612. But the court nonetheless concluded that the "comment rule" approved by California violated the Fifth Amendment. Id. at 613.

¶77 The Court quoted the following excerpt from Wilson, which described the reasoning behind 18 U.S.C. § 3481:

---

[6] Twining v. New Jersey, 211 U.S. 78 (1908).

[7] Malloy, 378 U.S. at 10-11.

17

> [T]he act was framed with a due regard also to those who might prefer to rely upon the presumption of innocence which the law gives to everyone . . . . The statute, in tenderness to the weakness of those who from the causes mentioned might refuse to ask to be a witness . . . declares that the failure of a defendant in a criminal action to request to be a witness shall not create any presumption against him.

Id. at 613 (quoting Wilson, 149 U.S. at 66). Griffin extrapolated that if "the words 'fifth Amendment' are substituted for 'act' and for 'statute' the spirit of the Self-Incrimination Clause is reflected" because "comment on the refusal to testify is a remnant of the 'inquisitorial system of criminal justice.'" Id. at 613-14. Accordingly, the Court held that the Fifth Amendment forbids "either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." Id. at 615.

¶78 This constitutional rule has not been without its critics. In Mitchell, the Supreme Court was asked whether Griffin prohibits a trial court from drawing an adverse inference from a defendant's silence during a sentencing hearing. Mitchell, 526 U.S. at 316-17, 327-28. The Court said it did. Id. at 328-29. Justice Scalia dissented, observing that "Griffin is out of sync with the historical understanding of the Fifth Amendment." Id. at 332 (Scalia, J., dissenting). However, he cautioned that he would not overrule Griffin because of the rule's widespread acceptance. Id. Justice Thomas agreed with Justice Scalia that Griffin lacked "foundation in the Constitution's text, history, or logic." Id. at 341 (Thomas, J., dissenting). But he wrote that he would reconsider Griffin in the appropriate case. Id. at 343.

18

¶79 Critiques aside, much of the application of <u>Griffin</u> has been left to lower courts. If a prosecutor made an explicit comment about the defendant's failure to testify, then a court easily found a <u>Griffin</u> violation. But what if a prosecutor made an indirect or implicit comment? This gave "lower federal courts problems." <u>Butler v. Rose</u>, 686 F.2d 1163, 1170 (6th Cir. 1982) (en banc). All lower federal courts——and most states—— eventually responded by adopting the test created by the Eighth Circuit in <u>Morrison</u>. <u>Id.</u> at 1170 & n.6 (collecting cases); <u>Moore v. State</u>, 669 N.E.2d 733, 738 (Ind. 1996) (collecting cases). Even though <u>Morrison</u> was premised on interpretation of the federal statute, <u>Griffin</u> has been understood as largely incorporating this preexisting body of law into the Fifth Amendment.

### E. Historical Summary

¶80 The bottom line is this. <u>Griffin</u> holds that commenting on a criminal defendant's failure to testify violates the Fifth Amendment. There is precious little evidence, however, that the original meaning of the Self-Incrimination Clause of the Fifth Amendment extends this far. The text does not say this, and the history does not bear this out. Rather, <u>Griffin</u> appears aimed at fulfilling the "spirit" of the Fifth Amendment by adding an additional layer of protection for defendants above and beyond the text. It enshrines the right to remain silent enumerated in the text, and functionally prohibits

19

improper inferences against defendants who exercise this constitutional right.

## II. ORIGINAL MEANING & BINDING PRECEDENT

¶81 In this case, our obligation as a lower court is to faithfully apply United States Supreme Court precedent. State v. Jennings, 2002 WI 44, ¶18, 252 Wis. 2d 228, 647 N.W.2d 142; United States v. Johnson, 921 F.3d 991, 1001 (11th Cir. 2019) (en banc). But Hoyle asks us to protect defendants even further by applying Griffin in a more robust way to cover the comments made by the prosecutor here. I do not believe Griffin or its progeny require us to do so for the reasons explained in the majority opinion, and I therefore join it. But the original meaning and historical record provide additional support for the decision not to extend Griffin further.

¶82 Justice Thomas has remarked that when there is little evidence suggesting a legal doctrine is grounded in the original meaning of the Constitution, "the Court should tread carefully before extending our precedents." Garza v. Idaho, 139 S. Ct. 738, 756 (2019) (Thomas, dissenting). I agree. When faced with the choice to extend precedent in these circumstances, we should "resolve questions about the scope of those precedents in light of and in the direction of the constitutional text and constitutional history." Free Enter. Fund, 537 F.3d at 698 (Kavanaugh, J., dissenting).[8]

---

[8] See also Josh Blackman, Originalism and Stare Decisis in the Lower Courts, 13 NYU J. L. & Liberty 44 (2019).

20

¶83 The dissent rejects this approach, largely because it rejects originalism as a methodology. Several reasons underlie its objections. First, the dissent proclaims originalism insufficiently determinate. In the dissent's view, originalism wrongly "assumes that each constitutional provision had a single, accepted original understanding." Dissent, ¶106 (quoting Erwin Chemerinsky, Worse Than Nothing: The Dangerous Fallacy of Originalism 56 (2022)). And in a case like this, reasonable judges will disagree about what constitutes extending precedent and what constitutes faithfully applying it. Id., ¶105. Therefore, my approach, as the dissent sees it, is susceptible to judges using originalism selectively to achieve their preferred results. Second, the dissent says that originalism will lead to unacceptable results, potentially undermining certain currently-accepted constitutional principles it thinks should not be up for debate. Id., ¶106. Finally, the dissent suggests the original meaning is just one tool among many in the task of interpreting legal texts. Id., ¶109.

¶84 I will not endeavor in this concurrence to provide a comprehensive response to these arguments, but I offer several brief points. First, in the abstract, the dissent is not wrong that originalism fails to give clear answers to every question, and is therefore vulnerable to manipulation. But originalism is not preferable simply for its clarity or ability to restrain judges (although in the main I believe it offers these virtues as well). The foremost reason judges must discern and follow the original meaning is because a written constitution is the

21

law, and all written laws should be construed to mean what they meant when they were written. District of Columbia v. Heller, 554 U.S. 570, 592 (2008); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 188 (1824); Serv. Emps. Int'l Union, Local 1 v. Vos, 2020 WI 67, ¶28, 393 Wis. 2d 38, 946 N.W.2d 35; State v. Roundtree, 2021 WI 1, ¶112, 395 Wis. 2d 94, 952 N.W.2d 765 (Hagedorn, J., dissenting). Originalism, like textualism, flows from the conviction that the text is the law, and our obligation is to be faithful to the meaning of the text. Vos, 393 Wis. 2d 38, ¶28; State ex rel. Bond v. French, 2 Pin. 181, 184 (Wis. 1849).

¶85 It is true that other considerations may impact how we decide cases. Precedent, for example, has an important role to play in disputes over legal issues that have already been decided. It is also true that sometimes fidelity to constitutional commands calls for judicial judgment——for example, upholding the right of the people against "unreasonable searches and seizures." See U.S. Const. amend. IV; Wis. Const. art. I, § 11. The dissent's objections on these grounds mistake originalism as a methodology for discerning the meaning of the Constitution with originalism as the only component of case adjudication. The divergent approaches of Justice Scalia and Justice Thomas on how they would respond to a hypothetical request to overrule Griffin are a prime example of this.

¶86 Yes, constitutional language can be hard to interpret in the first instance, and even harder to apply in practice.

22

The same is true for statutes.[9] But difficult cases do not change our obligation or goal. A textual puzzle is not a license to impose our own take on what the law should be. Our job when facing an unclear law is still to get as close as we can to what the text actually means. The dissent points to the competing history-filled opinions in Heller as a reason to doubt the utility of originalism. Dissent, ¶106 n.4. On the contrary, Heller is a fine example of what judges should do when confronted with a hard-to-understand law: comb the evidence, debate it, and try to get it right. Smart judges doing this well will disagree sometimes. That's okay. Indeterminacy is an inherent feature of law written by people. Thus, the dissent's criticism "isn't an attack against originalism so much as it is an attack on written law." Neil Gorsuch, A Republic, If You Can Keep It 113 (2019). And yes, some judges may exploit legal uncertainty or be inconsistent in their professed methodology. But the judiciary is filled with imperfect people who nonetheless swear an oath to faithfully read and apply the law impartially in every case. The fallibility of judges is the price we must pay for an independent judiciary. This reality says nothing about how judges should endeavor to carry out their

---

[9] See e.g., Becker v. Dane County, 2022 WI 63, ¶¶9-22, 403 Wis. 2d 424, 977 N.W.2d 390 (interpreting the meaning of "reasonable and necessary" in Wis. Stat. § 252.03); Friends of Frame Park, U.A. v. City of Waukesha, 2022 WI 57, ¶¶13-25, 403 Wis. 2d 1, 976 N.W.2d 263 (lead op.) (interpreting the meaning of "prevails in whole or in substantial part" in Wis. Stat. § 19.37(2)(a)); State v. Perez, 2001 WI 79, ¶¶15-60, 244 Wis. 2d 582, 628 N.W.2d 820 (interpreting the meaning of "a crime involving the use of the dangerous weapon" in Wis. Stat. § 968.20(1m)(b)).

responsibility to say what the law is, not what they wish the law to be.

¶87 Finally, the dissent fails to offer a competing vision for how to read the law accurately. Rather, the dissent lists a series of legal tools judges can consider: text, history, precedent, context, historical practice and tradition, and the "need to balance 'the majority's values against the values that should be protected from society's majorities.'" Dissent, ¶109 (quoting Chemerinsky, supra at 207). What the dissent misses is the end goal of these legal tools. They are not an a la carte menu from which judges can cherry-pick their preferred legal rationale. Rather, legal evidence and authority are legitimately and appropriately deployed when used in service of getting the law right. Several of these——text, history, context, historical practice, and even some precedent——can be relevant to discerning the original meaning of the Constitution. But where the meaning of the law comes into view, as it usually does even in hard cases, we do not have a license to override it by balancing competing values or any other outcome-focused concern.

¶88 At the end of the day, the dissent's method of picking the legal tools you like——what the text meant when written being merely one data point to consider——is a subtle invitation for judges to decide what the Constitution should mean, rather than to keep the focus on what it does mean. This must not be. Our founders did not establish a system of government where judges in our highest courts are unconstrained by the meaning of the

law the people have enacted, free to import their own values into the Constitution. Originalism may not answer every question. Originalist judges may not always be consistent. But we can be sure of this: A choose-your-own-adventure judicial methodology poses an even greater danger because it offers no rubric to grade one's fidelity to the law.

¶89 As I see it, where United States Supreme Court precedent is on point, we must apply it faithfully. But where we are asked to extend the logic of precedent into new areas, the original meaning ought to serve as the North Star toward which unresolved questions regarding the scope of those precedents should aim. In this case, I believe Griffin does not prohibit the prosecutor's comments. Furthermore, not extending Griffin to this factual scenario appropriately resolves this case in the direction of the original meaning of the constitutional text as best as I can discern. For these reasons, I respectfully concur.

¶90 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence.

25

¶91 REBECCA FRANK DALLET, J. *(dissenting).* The Fifth Amendment provides that no one "shall be compelled in any criminal case to be a witness against himself." U.S. Const. am. V. For that constitutional privilege to be meaningful, it must also prohibit the prosecutor or the court from telling the jury that the defendant's decision not to testify is evidence of guilt. See Griffin v. California, 380 U.S. 609, 615 (1965). Otherwise, such direct commentary on the defendant's exercise of his constitutional rights would "cut[] down on the privilege by making its assertion costly" and allow the prosecution or the court to penalize the defendant for holding the government to its burden of proving guilt beyond a reasonable doubt. See id. at 613-14.

¶92 But a defendant can also be penalized by an indirect comment on the failure to testify. That is because an oblique reference to the defendant's decision not to take the stand might nevertheless invite the jury to draw the natural, but impermissible inference that the defendant's silence demonstrates guilt. See Lakeside v. Oregon, 435 U.S. 333, 345 (1978) (Stevens, J., dissenting) ("Even if jurors try faithfully to obey their instructions, the connection between silence and guilt is often too direct and too natural to be resisted."). For that reason, federal and state courts across the country have held that even an indirect comment on the defendant's decision not to testify violates the Fifth Amendment if it is "manifestly intended to be or [is] of such a character that the

1

jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  See Butler v. Rose, 686 F.2d 1163, 1170 (6th Cir. 1982) (en banc); see also United States v. Cotnam, 88 F.3d 487, 497 (7th Cir. 1996) ("We have repeatedly recognized that indirect commentary on a defendant's failure to take the stand can also constitute a violation of the defendant's Fifth Amendment privilege not to testify."); State v. Johnson, 121 Wis. 2d 237, 248, 358 N.W.2d 824 (Ct. App. 1984).

¶93 One type of indirect comment that juries would "naturally and necessarily" understand as a reference to the decision not to testify occurs when the prosecutor repeatedly characterizes evidence as "undisputed" or "uncontradicted" and the only person who could reasonably have contradicted that evidence is the defendant.  See, e.g., Freeman v. Lane, 962 F.2d 1252, 1254-55, 1261 (7th Cir. 1992) (repeated statements that evidence only the defendant could dispute was "unrebutted" and "uncontradicted" violated the Fifth Amendment); Lent v. Wells, 861 F.2d 972, 974-77 (6th Cir. 1988) (prosecutor's comments in a sexual assault case that evidence only the defendant could rebut was "uncontradicted," and "unrebutted" were improper commentary on the defendant's decision not to testify).  Statements like these "naturally and necessarily" refer to the decision not to testify because they "'can only cause the jury to naturally look to the only other evidence there is—the defendant.'"  See United States v. Preston, 873 F.3d 829, 842 (9th Cir. 2017) (quoting Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987)).

2

¶94 Applying these cases, it is clear that the prosecutor violated Hoyle's Fifth Amendment rights by repeatedly characterizing as "uncontroverted" evidence only Hoyle could dispute. Hoyle was prosecuted for a sexual assault that occurred when he and the victim were alone in a car on a dead-end road in a rural area. There was no physical evidence, and accordingly, just Hoyle and the victim could have testified to what happened in that car. And because the jury heard only from the victim, her testimony about the sexual assault was uncontroverted.

¶95 Rather than focusing solely on the credibility of the victim's testimony, the prosecutor made the fact that her statements were uncontroverted the theme of his closing argument. In fact, this theme was so important that the prosecutor asked the circuit court to rule before trial that it was permissible.[1] In his closing argument, the prosecutor hammered his point relentlessly, repeatedly telling the jury that the victim's testimony was uncontroverted. In just nine pages of transcript, he described the victim's testimony as uncontroverted four times, and twice told the jury there was "no evidence disputing" her account. On rebuttal, he returned to that same theme, telling the jury "[y]ou need to make the decision based on the uncontroverted testimony of what she says

---

[1] In support of his motion, the prosecutor stated "I can't say [the evidence] is uncontroverted because the defendant didn't testify, but I can say that her testimony is uncontroverted and that [the jury] ha[sn't] heard any testimony to the contrary." The circuit court granted the motion.

3

occurred. They [the defense] don't disagree it's uncontroverted." But only Hoyle could have controverted the victim's testimony about what happened in his car that day. And for that reason, the jury would naturally and necessarily have taken the prosecutor's repeated characterization of the victim's testimony as "uncontroverted" as a comment on Hoyle's decision to exercise his Fifth Amendment right not to testify at trial. See Williams v. Lane, 826 F.2d 654, 665 (7th Cir. 1987) ("Only [the defendant] could possibly have rebutted both [the victim's] version of what happened after he pulled his car over . . . and her testimony that she did not consent.").

¶96 According to the majority, that is not enough to establish a Fifth Amendment violation, since the prosecutor's comments weren't "adverse" to Hoyle. See majority op., ¶38, n.11. In other words, the prosecutor did not "ask[] or intimate[] that the jury should interpret Hoyle's silence as an admission of guilt." Id. The majority cites no authority for the supposed requirement, but it appears to be drawing on State v. Jaimes, 2006 WI App 93, ¶22, 292 Wis. 2d 656, 715 N.W.2d 669, which said that a "comment must propose that the failure to testify demonstrates guilt" in order to violate the Fifth Amendment. Id. The problem is that none of the other federal cases discussed earlier contain such a requirement, and the case Jaimes cites as support, United States v. Robinson, 485 U.S. 25,

4

34 (1988), doesn't say that either.[2] That makes sense. "Given the prosecutor's institutional role, when the prosecutor merely 'comments' on the failure of an accused to testify, the reference is in all likelihood calculated to encourage the jury to equate silence with guilt." United States v. Mena, 863 F.2d 1522, 1534 (11th Cir. 1989). And that is especially true when the comment references the defendant's failure to dispute evidence that only he could rebut. Indeed, I can't imagine how such a comment could be taken as anything but "adverse" or "intimat[ing] that the jury should interpret Hoyle's silence as an admission of guilt." See majority op., ¶38 n.11.

¶97 Setting aside the majority's supposed requirement that the prosecutor's comments be "adverse," it concedes that repeatedly calling evidence only the defendant could dispute "uncontroverted" violates the Fifth Amendment. See majority op., ¶37. Nevertheless, the majority asserts that Hoyle's Fifth Amendment rights weren't violated here because "other evidence might exist that would controvert the State's witnesses." See id. In support, the majority points to defense counsel's statements in his closing argument about hypothetical evidence the police did not gather, namely statements from the victim's family members that they did not interview, physical evidence

---

[2] Lakeside v. Oregon, 435 U.S. 333, 338 (1978) does suggest that Griffin is "concerned only with adverse comment" on the defendant's decision not to testify. Nevertheless, Lakeside is distinguishable because it dealt with an instruction to the jury that it could not infer guilt from the defendant's failure to testify. See id. By contrast, the prosecutor's comments in this case drew negative attention to Hoyle's decision not to testify.

5

they did not collect, and surveillance footage from the place where the victim was dropped off after the assault that they did not obtain. See id. But the prosecutor's refrain throughout his closing argument was that the victim's account of what happened in Hoyle's car was undisputed. None of this other evidence, even if it existed, could have contradicted that account——only Hoyle could have done so. See Freeman, 962 F.2d at 1261 ("The only witness to this crime who was available to testify was [the victim], who identified [the defendant] as his assailant. Realistically, the only person who could satisfactorily rebut this testimony was [the defendant] himself." (citing Williams, 826 F.2d at 665)). Moreover, "[a] speculative possibility that some third party could have testified for the defense is not enough" to demonstrate that someone "'other than the defendant could rebut the evidence.'" United States v. Tanner, 628 F.3d 890, 899 (7th Cir. 2010) (quoting Freeman, 962 F.2d at 1260). Despite the majority's speculation about other possible evidence, the jury knew that only the victim and Hoyle could testify as to what happened in his car. For that reason, repeatedly calling the victim's testimony uncontroverted "impermissibly focus[ed] attention on the defendant's decision not to testify," and violated Hoyle's Fifth Amendment rights. See Freeman, 962 F.2d at 1260; see also Commonwealth v. Robertson, 431 S.W.3d 430, 437 (Ky. Ct. App. 2013) (concluding that comments in closing argument about the victims' "un-refuted" testimony were improper where "only one

6

person possessed the knowledge to conclusively rebut the testimony of the [victims]," the defendant).

¶98 The majority's alternative argument——that the prosecutor's comments were simply references to the jury instructions, which properly told jurors to evaluate only the evidence in reaching its verdict——is similarly unavailing. See majority op., ¶¶34-36. To begin with, only a few of the prosecutor's comments can fairly be read as references to the jury instructions, rather than Hoyle's decision not to testify. Before closing arguments began, the circuit court correctly instructed the jury that its job was to weigh the evidence, including the credibility of witnesses, and not to engage in speculation or to consider "in any manner" Hoyle's decision not to testify. And the prosecutor began his closing argument by referring back to those same instructions, noting that the jury was "supposed to just focus on what you heard yesterday with the testimony. [The victim's] testimony that she gave here yesterday is uncontroverted." Likewise, after summarizing the victim's testimony, the prosecutor again returned to the jury instructions, reminding jurors "[y]ou are not to sit there and say, what if I had this information, what if this was different, what if that was different? You're not to speculate . . . . You're to focus on what you heard yesterday . . . about how [the victim] was assaulted by this defendant." If the prosecutor had stopped there, I might agree with the majority that his comments did not cross the line. After all, the majority is right that there is no categorical prohibition on characterizing evidence

7

as uncontroverted, especially in the context of reminding jurors that their verdict must be based on the evidence presented at trial and not on speculation. See id., ¶31

¶99 But the prosecutor didn't stop there, or merely "lean on the jury instructions." Id., ¶35. Instead, he all but told the jury that it had to convict Hoyle because "[t]here is absolutely no evidence disputing" the victim's account of the sexual assault. The prosecutor emphasized that the victim's statements to law enforcement were "uncontroverted," her testimony at trial was "uncontroverted," the jury "heard no evidence disputing her account of that sexual assault," "You heard nothing," and most troublingly, that they "didn't hear from . . . anyone else testifying about" the assault. Then, on rebuttal, he tied the victim's undisputed testimony even more directly to the Hoyle's failure to testify, telling jurors that the defense did not "disagree [that the victim's testimony was] uncontroverted." His point, which he reiterated again and again, was that the victim's testimony about the sexual assault was uncontroverted, not that the jury should focus on the evidence and the court's instructions.

¶100 As many other courts have concluded, the more a prosecutor repeats statements like these, the more likely they are to be perceived by the jury as comments on the defendant's decision not to testify. See, e.g., Rodriguez-Sandoval v. United States, 409 F.2d 529, 531 (1st Cir. 1969); State v. McMurry, 143 P.3d 400, 404 (Idaho Ct. App. 2006); People v. Johnson, 429 N.E.2d 905, 910-11 (Ill. Ct. App. 1981). And that

8

is particularly true when, as here, those repeated comments occurred during a short closing argument and referred to the defense directly. Compare Rodriguez-Sandoval, 409 F.2d at 531 (describing a prosecutor's five references to uncontradicted testimony in his closing argument as "extremely aggravated from the quantitative standpoint"), with Webb v. Mitchell, 586 F.3d 383, 397 (6th Cir. 2009) (noting that an isolated comment did not "establish an extensive pattern in the context of the prosecutor's summation, which spanned ninety-four pages."). Accordingly, the jury in this case would not have perceived the prosecutor's statements as mere commentary on the jury instructions or the evidence the jury should consider. Rather, the jury would "naturally and necessarily" understand them as a repeated reminder that Hoyle——the only person who could have disputed the victim's account of what happened——did not testify. See Butler, 686 F.2d at 1170.

¶101 Additionally, the circuit court's decision to allow these comments was not a harmless error. An error is harmless if the State proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24 (1967). The State did not argue that allowing the prosecutor's comments was harmless. But even if it had, such an argument would be unavailing. Although the evidence presented at trial was certainly enough to support a guilty verdict, the prosecutor's repeated statements might have led the jury to give the victim's testimony too much weight or, worse yet, to treat Hoyle's decision not to testify

9

as a reason to find him guilty. The State therefore cannot demonstrate beyond a reasonable doubt that the violation of Hoyle's Fifth Amendment rights was harmless. See id.

¶102 In sum, a faithful application of Griffin and the principles it announced leads to just one conclusion: The prosecutor's comments violated Hoyle's Fifth Amendment rights. Accordingly, I respectfully dissent.

¶103 In closing, I want to address several points made by the concurrence about the supposed original public meaning of the Fifth Amendment and the role that meaning should play in this case and others. For starters, it's not clear what——if anything——the history of the Fifth Amendment can tell us about how its protections should apply today. If, as the concurrence asserts, defendants were not permitted to testify at the time of the founding,[3] then of course the framers of the Fifth Amendment weren't concerned with prosecutors commenting on the defendant's failure to testify. There would be no point in making such a comment since all defendants were required to remain silent. And for that reason, a jury obviously wouldn't draw any negative inferences from a defendant's silence either. But our courts have thankfully moved a long way from the practices of the Star Chamber and its ex officio oath, and legislatures across the country eliminated most prohibitions on defendants testifying

---

[3] State laws enacted shortly after the founding also prohibited slaves or people of color from testifying at trial if a white person was a party. See, e.g., Amanda Carlin, Comment, The Courtroom As White Space: Racial Performance As Noncredibility, 63 UCLA L. Rev. 450, 454-58 (2016).

10

more than a century ago. See concurrence, ¶¶57-74. Yet the concurrence simply assumes that, because the Fifth Amendment was adopted in a radically different context than today, contemporary courts must stand silent when prosecutors use a defendant's decision not to testify against him.

¶104 I disagree. Griffin and the cases addressing indirect commentary on a defendant's decision not to testify all recognize that comments suggesting that a defendant's silence is indicative of guilt are the functional equivalent of compelling a defendant to testify. See, e.g., Griffin, 380 U.S. at 614-15; Butler, 686 F.2d at 1170. Such comments penalize the defendant for exercising his constitutional right to remain silent——little different than the Star Chamber holding Lilburne in contempt for his silence. See concurrence, ¶56. If the Fifth Amendment's privilege against self-incrimination is to mean anything today, it must protect against prosecutors who invite the jury—— directly or indirectly——to penalize the defendant for exercising his constitutional right to remain silent.

¶105 More fundamentally though, there are at least two reasons to reject the concurrence's proposal that "when there is little evidence suggesting a legal doctrine is grounded in the original meaning of the Constitution, '[we] should tread carefully before extending [that] precedent[].'" Concurrence ¶82 (quoting Garza v. Idaho, 139 S. Ct. 738, 756 (2019) (Thomas, J., dissenting)). First, we are bound by all United States Supreme Court decisions——not just the ones any individual justice feels are "grounded in the original meaning of the

11

Constitution." Concurrence, ¶82. And although the concurrence concedes this point, it fails to acknowledge that reasonable judges can disagree about whether a particular decision "extends" or merely faithfully applies existing precedent to different facts or circumstances. See United States v. Johnson, 921 F.3d 991, 1001 (11th Cir. 2019) (en banc) ("[W]e must apply Supreme Court precedent neither narrowly nor liberally——only faithfully."). There is no objective test for deciding whether or not we are "extending" a prior precedent. Accordingly, a results-oriented judge could use the concurrence's approach to distinguish existing precedent on superficial grounds, and then decline to "extend" that precedent in order to achieve their desired result. See, e.g., Caroline Mala Corbin, Opportunistic Originalism and the Establishment Clause, 54 Wake Forest L. Rev. 617, 618 (2018) (describing the United States Supreme Court's use of originalism as "opportunistic because sometimes the Court relies on it, and sometimes it does not.").

¶106 Second, but more importantly, I disagree with the concurrence's conclusion that constitutional interpretation should always be guided by the original public meaning of the provision at issue. "[T]he search for 'original meaning' assumes that each constitutional provision had a single, accepted original understanding." See Erwin Chemerinsky, Worse Than Nothing: The Dangerous Fallacy of Originalism 56 (2022).

12

But in reality, that consensus often didn't exist.[4]  See id. Given that originalism bills itself as a determinate and value-neutral alternative to other methods of constitutional interpretation, this is a problem.  See Frank B. Cross, The Failed Promises of Originalism 13 (2013) ("The best functional case for originalism lies in its claimed objectivity and neutrality.")  Because a single, objective original public meaning often doesn't exist, originalism cannot deliver the objective answers that it promises, let alone constrain judges who might want to decide cases in ways that fit with their preferences.  See Chermerinsky, supra at 56-58.  And in that respect, originalism is no different than any other interpretive methodology, only it allows its adherents to hide their lack of constraints behind a false patina of objectivity.  Worse yet, if originalism is taken to its logical conclusion, it would result in the radical rejection of long-settled constitutional principles.  Indeed, one of the opinions the concurrence cites argues that the Sixth Amendment's guarantee of counsel to indigent criminal defendants is at odds with the Constitution's original public meaning.  See Garza, 139 S. Ct. at 757 (Thomas, J., dissenting).  That's not all though.  Brown v. Board of

---

[4] This point is illustrated by the United States Supreme Court's decision in District of Columbia v. Heller, 554 U.S. 570 (2008).  Justice Scalia's majority opinion argued that the text and history of the Second Amendment supported a constitutional right to possess a gun for self-defense in the home.  See id. at 595.  But Justice Stevens' dissent contended that text and history supported the opposite result.  See id. at 640 (Stevens, J., dissenting).  In short, history is often in the eye of the beholder.

Education,[5] same sex marriage, virtually all rights of women[6] and racial minorities, and any number of other fundamental rights are difficult, if not impossible, to justify on originalist grounds. See Chemerinsky, supra at 92-114. As one scholar put it, "[t]he only kind of originalism that is reasonably determinate leads to conclusions that practically no one accepts. But less determinate forms of originalism can be enlisted to support pretty much anything." David A. Strauss, Can Originalism Be Saved?, 92 B.U. L. Rev. 1161, 1162 (2012).

¶107 The concurrence concedes that "originalism fails to give clear answers to every question, and is therefore vulnerable to manipulation," but nonetheless argues that we must adopt it because "a written constitution is the law, and all written laws should be construed to mean what they meant when they were written." Concurrence, ¶84. But this argument for originalism is circular. It simply defines "interpretation" "as synonymous with originalist interpretation" and then uses that definition as evidence that only originalist interpretation is permissible. See Andrew B. Coan, The Irrelevance of Writtenness in Constitutional Interpretation, 158 U. Pa. L. Rev.

---

[5] 347 U.S. 483 (1954).

[6] Indeed, just last year, the United States Supreme Court concluded that "history and tradition" led to the "clear answer . . . that the Fourteenth Amendment does not protect the right to an abortion." Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228, 2248 (2022). But as in Heller, the history on which the majority relied is contested. See id. at 2324 (Breyer, Sotomayor, and Kagan, JJ., dissenting) ("[E]mbarrassingly for the majority . . . early law in fact does provide some support for abortion rights.").

1025, 1030 (2010); see also Cherminsky, supra at 26 ("[A]rguments from definition aren't arguments at all; they do not defend their conclusion but assume it."). There are, however, any number of non-originalist ways of interpreting the Constitution that nevertheless give effect to its text. See Coan, supra at 1047 (identifying, for example, an approach that treats the text as "one of many legitimate ingredients in a pluralistic practice of constitutional adjudication."). Simply observing that the Constitution was written down isn't enough to demonstrate that originalism is required.

¶108 No matter our approach, however, it is important to emphasize that constitutional interpretation is rarely as simple as merely reading the words and applying them. Most of the Constitution's key provisions, like the guarantees of "equal protection of the laws" and "due process," or the protections against "unreasonable searches and seizures" or "cruel and unusual punishment" are vague——and deliberately so. See generally U.S. Const. am. IV, V, VIII, XIV. In writing these open-ended clauses, the Framers weren't trying to settle every legal question that might arise under these provisions for all time.[7] They were instead trying to create a document that would

---

[7] Moreover, even when the Constitution uses more precise language, like the First Amendment's statement that "Congress shall make no law respecting an establishment of religion . . . or abridging the freedom of speech," it often doesn't mean what it says. See U.S. Const. am. I. Nobody would say, for example, that "[b]oth the President and the federal courts could abridge the freedom of speech and prohibit the free exercise of religion, because the First Amendment, by its terms, applies only to 'Congress.'" See David A. Strauss, Foreword: Does the Constitution Mean What It Says?, 129 Harv. L. Rev. 1, 3 (2015).

endure by "provid[ing] a political platform wide enough to allow for considerable latitude within which future generations could make their own decisions." Joseph J. Ellis, The Quartet: Orchestrating the Second American Revolution, 1783-1789, at 219 (2015); see also Jack M. Balkin, Living Originalism 27 (2011) ("[C]onstitutional framers and ratifiers very often use open-ended language that deliberately delegates questions of application to future interpreters."). In making those decisions, the Framers did not expect their views would govern over those of future generations either. Indeed, James Madison himself said that his notes from the Constitutional Convention "could never be regarded as the oracular guide in expounding the Constitution." Boris I. Bittker, Interpreting the Constitution: Is the Intent of the Framers Controlling? If Not, What Is?, 19 Harv. J.L. & Pub. Pol'y 9, 32 (1995) (quoting 5 Annals of Cong. 776 (1796)). And Thomas Jefferson cautioned that a "sanctimonious reverence" for the Framers was akin to "requir[ing] a man to wear still the coat which fitted him when a boy." Letter from Thomas Jefferson to Samuel Kercheval (July 12, 1816), in 10 Paul Leicester Ford, Writings of Thomas Jefferson 42-43 (1899).

¶109 In sum, constitutional interpretation nearly always requires more than merely construing the text "to mean what [it] meant when [it] w[as] written." See concurrence, ¶84. And that is true whether one is an originalist or not. No method of constitutional interpretation can provide objective, value-neutral decisions in all cases. But that doesn't mean that we

16

are engaged in a "choose-your-own-adventure" exercise, deciding cases based on what we think "the Constitution should mean, rather than . . . what it does mean." See concurrence, ¶88. In my view, interpreting the Constitution faithfully requires us to read its text and history carefully, but also to consider precedent, context, historical practice and tradition, and the need to balance "the majority's values against the values that should be protected from society's majorities." Chemerinsky, supra, at 207. That, after all, is what the Constitution is all about.

¶110 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

17