COURT OF APPEALS
DECISION
DATED AND FILED

March 26, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2022AP1091-CR**

STATE OF WISCONSIN

Cir. Ct. No.  2016CF1728

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

MATTHEW JOSEPH MYKE,

  DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Brown County:  JOHN P. ZAKOWSKI, Judge.  *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Matthew Myke appeals a judgment convicting him of repeated sexual assault of the same child.  He also appeals an order denying his

motion for postconviction relief. Myke argues that his trial counsel were constitutionally ineffective by failing to advise Myke on his right to testify at trial and prepare him to testify, by failing to investigate and call certain witnesses, and by failing to object to the prosecutor's comments on Myke's silence during closing arguments. Myke also argues that the circuit court deprived him of his constitutional right to present a defense by excluding from evidence certain text messages between Myke and his ex-wife. We reject Myke's arguments and affirm.

## BACKGROUND

¶2      According to the operative Information, the State charged Myke with repeatedly sexually assaulting Ann between October 2011 and March 2013,[1] when she was about fourteen years old. Ann reported the assaults in 2016, about two to three years after they occurred. The stated date range was consistent with Ann's allegations that the assaults occurred after the birth of Myke's daughter in October 2011 and during the course of his relationship and marriage to Melinda, which ended in March 2013.[2]

¶3      Before trial, the State sought to exclude from evidence text messages that Melinda sent to Myke after their marriage ended regarding child custody and placement issues. Myke's trial counsel sought to use the messages to attack Melinda's credibility by showing her bias against Myke and to note that the sexual

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2021-22), we use a pseudonym when referring to the victim in this case. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Because Myke and Melinda share the same surname, we will refer to Melinda by her first name.

assault allegations were not made until after Myke had made attempts to see his daughter.[3]  The circuit court excluded the messages because it was concerned with having a "trial within a trial," because the messages would open the door to prejudicial evidence against Myke, and because the messages did not include Myke's responses to them.

¶4      At trial, Ann testified that she was a close family friend of Melinda and would often babysit Melinda's children.[4]  Ann also stated that Melinda was "like a mother figure" to her.  She spent time with Myke, Melinda, and their children at their home at least twice a week.  Ann then testified about the multiple instances when Myke sexually assaulted her.  Ann did not immediately report the assaults because she believed that people would be angry with her and that it would destroy her relationship with Melinda or Ann's family.  She did not tell Melinda about the assaults before reporting them to law enforcement with the assistance of her aunt.  Ann also testified that she later met with the State's prosecutor and provided more details about two of the incidents.[5]

¶5      On cross-examination, Ann admitted that, on the morning before trial, she reviewed her written statement to law enforcement and the November 26, 2018 letter the State sent to Myke's counsel regarding the additional details.  Ann further admitted that when she first reported the assaults, she had not provided law enforcement with some of the details to which she testified at trial, but she

---

[3] Myke was represented by two attorneys, Shane Brabazon and Quinn Jolly, before and during trial.

[4] Melinda had four children, one of whom she had in common with Myke.

[5] On November 26, 2018, the State sent a letter to Myke's counsel disclosing the additional details that Ann had provided.

explained that she later provided those details either to the prosecutor pretrial or during her trial testimony.

¶6     Melinda testified that she was still married to Myke but that they had been separated for several years. She married Myke in 2011, and their daughter was born that same year. Melinda also testified that Ann was like a sister to her kids and that Ann was always over at their house. She never saw Myke do anything inappropriate with Ann, and she denied ever having encouraged Ann to report that she was sexually assaulted by Myke. Melinda further testified that her relationship with Myke ended around April 2013 and that her custody dispute with Myke ended in June 2014. On cross-examination, Melinda admitted that she "had a really not that great [of a] relationship" with Myke after they separated.

¶7     Myke chose not to testify, and the circuit court conducted a colloquy on his decision. After the colloquy, the defense rested without having called any witnesses. During the State's rebuttal argument in closing, Myke's counsel requested a sidebar with the court and raised a concern that the prosecutor was improperly getting close to referring to Myke's decision not to testify. The prosecutor agreed to move his argument in a different direction, and the court therefore took no action on the defense's concern.

¶8     The jury found Myke guilty of the crime charged, and the circuit court subsequently imposed a twenty-year sentence consisting of ten years of initial confinement followed by ten years of extended supervision. Myke filed a postconviction motion seeking a new trial on the grounds that he received ineffective assistance of trial counsel and that the court deprived him of his right to

present a defense by excluding the text messages from evidence. The court held a *Machner* hearing at which Myke and his trial counsel testified.[6]

¶9     The circuit court denied Myke's postconviction motion in a written decision, concluding that Myke's trial counsel were not deficient in any of the alleged manners and that the court had appropriately excluded the text messages between Myke and Melinda. Myke now appeals. Additional facts will be provided as necessary below.

## DISCUSSION

### I. Ineffective assistance of trial counsel

¶10     An ineffective assistance of counsel claim requires the defendant to show both that "counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The claim presents a mixed question of law and fact. *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93. The circuit court's findings regarding the factual circumstances of the case, trial counsel's conduct, and trial counsel's strategy are findings of fact that we do not overturn unless they are clearly erroneous. *Id.* Whether counsel's performance was deficient and whether the deficient performance prejudiced the defense are questions of law that we review de novo. *Id.*, ¶¶38-39. We need not address both prongs if the defendant fails to make a showing on one. *Id.*, ¶37.

---

[6] *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

¶11 In evaluating counsel's performance, we strongly presume that counsel's conduct fell "within the wide range of reasonable professional assistance," and we give counsel's strategic decisions great deference. *Id.*, ¶38 (citation omitted). "In fact, where a lower court determines that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'" *Id.*, ¶65 (citation omitted). Prejudice requires the defendant to show that "but for his [or her] lawyer's error, there is a reasonable probability the jury would have had a reasonable doubt as to guilt." *State v. Sholar*, 2018 WI 53, ¶45, 381 Wis. 2d 560, 912 N.W.2d 89. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Id.*, ¶33 (citation omitted).

A. *Myke's decision whether to testify*

¶12 Myke first argues that his counsel performed deficiently by failing to "meaningfully" advise him about whether he should testify at trial and by failing to advise him on the importance of being prepared to testify if he decided to testify. Myke contends that counsel must do more than tell a client that the decision whether to testify is entirely up to the client, which he insists is all that occurred in his case. Here, however, Myke made it clear to both of his counsel that he did not want to testify, and a defendant's decision whether to testify on his or her own behalf *is* the defendant's decision alone. *See State v. Nelson*, 2014 WI 70, ¶24, 355 Wis. 2d 722, 849 N.W.2d 317. Moreover, and contrary to Myke's arguments, the circuit court found that both of Myke's counsel *did* advise him regarding his right to testify and the risks associated with testifying, and evidence supports that finding.

¶13 At the *Machner* hearing, both Attorney Brabazon and Attorney Jolly testified that they talked to Myke several times about his decision to testify. Brabazon testified that: he advised Myke about his right to testify; it was a "he said, she said" case; Myke had seen Ann testify; Myke would have to decide if he wanted to testify; and Myke would have a colloquy with the circuit court to ensure the decision was Myke's decision. Jolly was even more involved in discussions with Myke regarding whether he should testify at trial. In particular, Jolly testified that he helped prepare Myke to testify at trial by talking about potential witnesses and what they might say. When Myke adamantly expressed that he did not want to testify, Jolly recalled discussing that decision with Myke and telling him that "the only way his story is coming in is if he testifies."

¶14 Brabazon testified that, in general, he reminds clients during trial to think about whether they want to testify. According to Brabazon, he advises clients on their decision by explaining the benefits and consequences of testifying and by sharing his experiences with clients testifying or declining to do so. Similarly, Jolly testified that he advises clients that the decision to testify should be based on what occurs during the trial and that he always gives his opinion on whether a client should testify. Moreover, both Brabazon and Jolly testified that Myke never wavered on his decision not to testify. As Brabazon explained, Myke "was very adamant that he was not going to testify. He didn't need to because he was innocent. He was very short, very definitive in his response. He did nothing wrong. He was—didn't see any need—reason for him to testify." Similarly, Jolly testified that Myke did not express that he felt unprepared to testify because he had "never wanted to testify."

¶15 At the *Machner* hearing, Myke denied telling his counsel that he did not have to testify because he was innocent. Myke did, however, confirm that

Brabazon explained that he did not have to testify and that it might be better if Myke did not testify because there was no evidence against him. Myke also testified that Brabazon explained that if he did testify and he seemed nervous while testifying, then it could make him look guilty. Myke further testified that Brabazon talked to him about the consequences of testifying in general terms but insisted that he wanted advice on his specific case. All of the foregoing represents reasonable—and "meaningful"—advice on whether Myke should exercise his right to testify in this particular case.

¶16 In short, and as the circuit court expressly found in its written decision, Myke was reasonably advised of his right to testify "and the risks associated with testifying." Moreover, based on the foregoing, Myke's counsel did prepare him to testify, but Myke adamantly refused to do so and, ultimately, chose not to testify. There is no evidence that Myke's decision not to testify was based on a lack of preparation. That decision was his alone to make. *See Nelson*, 355 Wis. 2d 722, ¶24. Accordingly, Myke's counsel did not perform deficiently in this regard.

### B. Investigating and calling certain witnesses

¶17 Myke next argues that his counsel performed deficiently by not interviewing Andrew Thomas, a witness on Myke's witness list, who did not testify but whom Myke claims could have refuted one of Ann's multiple sexual assault allegations. At trial, Ann testified that, one night, Myke and Melinda had several friends over at their house after the Oneida Pow Wow. When Melinda left to drop off their friends, Ann testified that Myke sat next to her on the couch where she would be sleeping, asked her if she knew what a popsicle was, and placed her hand on his penis. She did not know what time of the night this

8

occurred, but she testified that it was "pretty late." At the *Machner* hearing, Myke testified that Thomas would have known that Myke was the first one to go to sleep on that particular night and that several guests remained at Myke's house after he went to sleep.

¶18 Thomas's testimony, however, would have addressed only one of the numerous sexual assaults about which Ann testified, and it would not have been inconsistent with Ann's testimony. As noted, Ann testified that Myke came out of his room at some point in the night and sexually assaulted her. Thomas's testimony about Myke being the first one to go to sleep is not inconsistent with Ann's testimony because, as the State notes, "there is no reason to believe Myke could not have simply gone into his bedroom early and then come back out later."

¶19 Additionally, Myke did not provide an affidavit or statement from Thomas about what he would have testified to at trial. Thomas did not even testify at the *Machner* hearing, including as to what his proposed trial testimony would have been. All that Myke provides is his own testimony about what he believes Thomas would have said.

¶20 Furthermore, Thomas's failure to testify at Myke's trial is attributable to Myke himself, given that he never provided his counsel with information demonstrating the importance of Thomas testifying. Counsel's actions are usually based on information supplied by the defendant, and the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. At the *Machner* hearing, Brabazon testified that his investigator reached out to Myke to acquire information about possible witnesses for trial. He could not recall whether the investigator talked to Thomas, but he did recall that the phone

number that Myke provided for Thomas only received text messages but not phone calls. Brabazon also testified that he may have sent a text message to Thomas, but he never received a response. Both Brabazon and Jolly also testified that Myke told them that he would bring Thomas to court for trial, but Myke did not do so.

¶21 We also note that both Brabazon and Jolly testified that it was difficult to obtain information from Myke in general. Specifically, Brabazon testified that they had trouble getting Myke to respond to them, which hindered their ability to vigorously represent him. Jolly testified that he repeatedly asked Myke to provide him with a list of potential witnesses and their contact information, but Myke provided only one name.[7] Jolly noted that his requests reached a point where he wrote a letter to Myke "stating this is what we need and would you please contact us." Based on both Brabazon's and Jolly's testimony, the circuit court noted its impression that Myke "was a quiet individual who did not volunteer a lot of information to his attorneys."

¶22 Based on the foregoing, we conclude that Myke has failed to meet his burden to show that his counsel performed deficiently by failing to interview and call Thomas as a witness.

¶23 Myke also argues that his trial counsel performed deficiently by not locating and presenting any witnesses that could testify to Myke's good character.

---

[7] At the ***Machner*** hearing, Myke also testified that he told the investigator about Melinda's aunt as a potential witness. He stated that Melinda's aunt approached him the day before he was arrested and told him that she "didn't agree to what Melinda was trying to do" to Myke. On cross-examination, however, Myke admitted that he only knew the last name of Melinda's aunt and that he did not have her contact information.

Myke contends that counsel's failure to do so was not based on a reasonable strategy but on a mistake of law. At the **Machner** hearing, Brabazon testified that he did not develop character witnesses for Myke because he believed that he could not offer evidence of Myke's character unless the State first challenged Myke's character. Myke also testified that he asked Brabazon whether it would be beneficial to have people testify about his character, but Brabazon said it would not help. Myke believed that his current partner and the people who wrote character letters for his sentencing could have testified about his character at trial.

¶24 Myke is correct that Brabazon mistakenly believed he could not offer evidence of Myke's character unless it was first attacked by the State.[8] Nevertheless, Brabazon explained that the trial strategy was not about Myke's character but rather to focus on the significant inconsistencies in Ann's story. Jolly similarly testified that the theory of defense was that Myke was innocent and that there were issues with Ann's allegations. Likewise, the circuit court found that "the trial was about the victim's character, not [Myke's] character." It further found that even if Brabazon's view of the law was mistaken, "he would not have gone the route of presenting character witnesses" and "believed the focus was on the credibility of the complaining witness."

¶25 Despite Brabazon's mistaken view of the law, we agree with the circuit court that the decision not to call character witnesses was "a reasonable exercise in trial strategy," given that the trial strategy was to focus on Ann's inconsistencies. *See* **Breitzman**, 378 Wis. 2d 431, ¶¶38, 65. Calling character

---

[8] WISCONSIN STAT. § 904.04(1)(a) allows a defendant to present evidence of a pertinent character trait. On appeal, the State concedes trial counsel's mistake of law in this regard.

witnesses for Myke would have taken the focus off Ann and the inconsistencies in her allegations.

¶26    And, as noted above, Myke failed to provide his counsel with information on potential character witnesses other than Thomas. Indeed, the circuit court expressly found that "the most significant reason there were not witnesses developed for trial testimony is because of lack of information from [Myke] himself." In short, we conclude that Myke's counsel did not perform deficiently by not locating and presenting character witnesses for Myke.

## C. State's comments during closing arguments

¶27    Finally, Myke argues that his counsel performed deficiently by failing to object to the prosecutor's allegedly improper comments during the State's closing argument. Myke asserts that the prosecutor repeatedly referred to Myke's decision not to testify, accused Myke's counsel of misrepresenting evidence, and mischaracterized his counsel's argument "about [Ann] having access to written statements" to law enforcement and the State's November 26, 2018 letter to Myke's counsel "to review to prepare to testify as defense counsel accusing the prosecutor and [Ann] of engaging in a conspiracy to manufacture evidence."

¶28    During his closing argument, the prosecutor referred to the State's admitted lack of physical evidence, such as DNA or video evidence. The prosecutor then explained the evidence that the State did have:

> What we do have is sworn testimony of witnesses. The sworn testimony of the person who this happened to. Sexual assault happens in private. There are two people who know what happened in that incident. You heard testimony from one of them. The only person that shared any information with you about what happened in those

> intimate settings is [Ann]. Her testimony is uncontroverted.
>
> As you decide about [Ann]'s testimony you're obviously going to have to decide about her credibility. If you believe her, if you believe what [Ann] told you about the incidents that happened to her, that's it. This case is over.

Counsel did not object during the State's closing argument.

¶29 During his closing argument, Myke's counsel (Brabazon) made several remarks about Ann's testimony. Specifically, counsel commented on Ann reviewing her statement to law enforcement and the State's November 26, 2018 letter to Myke's counsel the morning before she testified at the trial: "It's studying for the test, and that's why it makes sense when she says I can't remember everything word for word." Counsel then argued that another problem with Ann's testimony was that the prosecutor prompted her into talking about an instance of sexual assault: "She says, oh, yeah, and it wasn't, the way I heard it was like she wasn't remembering it from what happened. It was remembering it like, oh, I read about that earlier today. Let me tell you about that, too." Counsel stated:

> The State is saying don't judge [Ann] on her recollection of the events, her lack of details, her lack of consistency, don't judge her credibility on the reasonableness of her testimony, don't judge the evidence on what actually happened. As long as she remembered what she wrote down in the report and study it a couple of hours before she got on the stand it must be true.

Counsel then commented on the State's failure to perform a full investigation of Ann's allegations: "[I]t's a little disingenuous of the State to say search for the truth when that's the last thing the State wanted for. The last thing the State wanted to do is fully investigate this case."

¶30    In rebuttal, the prosecutor responded to counsel's implication that "the only way that [the jury] can find this is a not guilty verdict is if [Ann] lied and [the prosecutor] conspired with her to make her lie" and that they "worked together to, for no reason whatsoever, find this man guilty of sexual assault." The prosecutor explained that "every witness that ever testifies on the stand is given the opportunity to review the information about their case before" testifying and that Ann was not "studying for an exam and failing it by not getting it word for word." The prosecutor then made the following comment, after which Myke's counsel requested a sidebar and the prosecutor agreed to move his argument in another direction:

> The evidence in this case tells you that [Ann] was sexually assaulted over the course of several different events that occurred within an 18-month time period. The only evidence in this case that was presented to you is that Matthew Myke engaged in these acts. That's it. That's the only person that was present during those incidents that talked about what happened is [Ann]. She's the one who gave you the evidence in this case.

¶31    At the *Machner* hearing, Brabazon testified that he makes strategic decisions as to objections during closing arguments because he does not want the jury to view him negatively. If the jury perceives him negatively, it does not help his client. The circuit court found that Brabazon's decision not to object was an appropriate trial strategy "to prevent him [from] appearing overly argumentative to the jury or to bring more attention to the prosecutor's statement." The court also found that the prosecutor's response to Brabazon's comment about the prosecutor's prompting of Ann and her "studying for the test" was a fair response. We agree with the court that Brabazon's decision not to object to these responses was a reasonable strategic decision and that the prosecutor's comments were a fair response to counsel's own comments. *See Breitzman*, 378 Wis. 2d 431, ¶¶38, 65.

14

¶32     As for the prosecutor's comments in his initial closing and rebuttal that indirectly referred to Myke's decision not to testify, Myke argues that they "could only have been designed to equate [Myke's] silence with guilt."[9]   A prosecutor may not adversely comment on a defendant's decision not to testify. *See State v. Hoyle*, 2023 WI 24, ¶¶21, 24, 406 Wis. 2d 373, 987 N.W.2d 732.

¶33     In *Hoyle*, our supreme court held that three elements must be present for a prosecutor's comment to constitute an adverse reference to the defendant's failure to testify. *Id.*, ¶29.   First, the comment "must have been 'manifestly intended to be' or was 'of such character that the jury would naturally and necessarily take it to be' a 'comment on the failure of the [defendant] to testify.'" *Id.* (alteration in original; citations omitted).   Second, the comment "must also have been 'manifestly intended to be' or was 'of such character that the jury would naturally and necessarily take it to be' 'adverse,' meaning comment 'that such silence is evidence of guilt.'" *Id.* (citations omitted).   Finally, the comment "must not have been 'a fair response to a claim made by defendant or his [or her]

---

[9] Myke also argues that we should apply our decision in *State v. Hoyle*, No. 2020AP1876-CR, unpublished slip op. ¶¶1-2 (WI App Apr. 26, 2022), to this case.   There, we concluded that a prosecutor's repeated argument that the State's evidence was "uncontroverted" was improper and violated Hoyle's right not to testify at trial. *Id.*   The Wisconsin Supreme Court subsequently reversed and remanded our decision on this issue in *State v. Hoyle*, 2023 WI 24, ¶¶1-3, 406 Wis. 2d 373, 987 N.W.2d 732.

In this regard, we also note that to prove that counsel was ineffective for not objecting to the prosecutor's comments at issue, Myke must show that it was settled law that those comments were improper. *See State v. Breitzman*, 2017 WI 100, ¶49, 378 Wis. 2d 431, 904 N.W.2d 93. "[F]ailure to raise arguments that require the resolution of unsettled legal questions generally does not render a lawyer's services 'outside the wide range of professionally competent assistance' sufficient to satisfy the Sixth Amendment." *Id.* (alteration in original; citation omitted).   Given that the closing arguments in this case occurred in early 2020—i.e., well before our April 2022 decision in *Hoyle*—and our supreme court reversed our application of applicable law in this particular context, the relevant law that Myke faults his counsel for not applying was decidedly unsettled at the time.

counsel.'" *Id.* (citation omitted). Applying the foregoing test, our supreme court concluded that a prosecutor's comments repeatedly referring to the State's evidence as "uncontroverted" were, when taken in context, "neither 'manifestly intended to be' nor 'of such character that the jury would naturally and necessarily take [them] to be' a comment on [the defendant]'s silence." *Id.*, ¶39 (first alteration in original; citation omitted).

¶34 Similarly here, we conclude that the prosecutor's comments—that Ann was the only person who shared any information with the jury about what happened, that Ann's testimony was uncontroverted, and that the only person who talked about the incidents and gave the jury the evidence in the case was Ann—when taken in context, were not comments on Myke's decision not to testify. Rather, the prosecutor was explaining the evidence the State did not have—DNA evidence and physical evidence—and the evidence it did have—witness testimony. He further explained that the State only had witness testimony because "[s]exual assault happens in private." The prosecutor then stated that, in order to convict Myke, the jury had to decide on Ann's credibility and whether it believed Ann.

¶35 When taken in context, the prosecutor's comments were neither manifestly intended to be, nor were they, of a character that the jury naturally and necessarily took them to be a comment on Myke's decision not to testify. Instead, the prosecutor was explaining why the only evidence of the assaults that the State had was Ann's testimony and that her testimony was enough to convict Myke, if the jury found her credible. Therefore, the prosecutor's comments were not an

improper reference to Myke's decision not to testify. Accordingly, counsel was not deficient by failing to object to the comments on this basis.[10]

## II. Myke's right to present a defense

¶36 Myke also argues that the circuit court denied him the right to present a defense by excluding from evidence text messages between himself and Melinda regarding their child custody dispute. He asserts that the court committed error when it "essentially ruled that the messages could not be used at trial because the complete conversation was not depicted in the messages." He further asserts that the messages established Melinda's motive to harm Myke and that motivation "was the only hypothesis approaching a theory of defense that trial counsel presented at any point in the trial."

¶37 We uphold a circuit court's evidentiary rulings if the court "examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *State v. Munford*, 2010 WI App 168, ¶27, 330 Wis. 2d 575, 794 N.W.2d 264 (citation omitted). "Although a [circuit] court's admission or exclusion of evidence is within its reasoned discretion," we review de novo whether the court's "exclusion of evidence deprived a defendant in a criminal case of his or her right to present a defense." *State v. Ward*, 2011 WI App 151, ¶15, 337 Wis. 2d 655, 807 N.W.2d 23. The exclusion of evidence violates a defendant's right to present a defense only when the proffered evidence is

---

[10] Myke also argues that his counsel's cumulative errors affected the reliability of the proceedings. *See State v. Thiel*, 2003 WI 111, ¶59, 264 Wis. 2d 571, 665 N.W.2d 305. Because we conclude that counsel did not perform deficiently in any of the ways that Myke alleges, he was not prejudiced by the cumulative effect of these errors.

essential to the defense and the defendant has "no reasonable means of defending his [or her] case" without the proffered evidence. *State v. Williams*, 2002 WI 58, ¶70, 253 Wis. 2d 99, 644 N.W.2d 919 (citation omitted).

¶38     Here, the circuit court did not erroneously exercise its discretion by excluding the text messages between Myke and Melinda because the messages contained information that was actually prejudicial to Myke and created the potential for jury confusion.   The fact that the messages were incomplete— insomuch as they did not include Myke's responses to them—was not the only reason the court excluded the messages.  The court was also concerned with the messages' limited relevance because the custody dispute ended in 2014, well before Ann made the sexual assault allegations.

¶39     The circuit court was further concerned with the prejudicial information against Myke that the text messages could reveal.  Specifically, the court was troubled with messages that referred to Myke "sleeping with" a different fourteen-year-old girl and messages that would open the door to the State referencing a domestic violence incident between Myke and Melinda.  Finally, the court was concerned with having a "trial within a trial" regarding the custody dispute between Myke and Melinda and "get[ting] away from the issue at hand." The court reiterated these concerns in its decision denying Myke's postconviction motion.

¶40     In short, the circuit court properly excluded the text messages between Myke and Melinda because, in addition to them being incomplete, the messages would likely be prejudicial to Myke in several ways and created the potential for jury confusion by distracting the jury over a custody dispute that

ended well before any sexual assault allegations were made. *See* WIS. STAT. § 904.03.

¶41    The exclusion of the text messages also did not violate Myke's right to present a defense because the messages were not essential to his defense—i.e., that Ann was fabricating the sexual assault allegations—and their exclusion did not leave Myke without reasonable means of defending his case. The messages were not essential because they had limited relevance, given that they referenced a custody dispute between Myke and Melinda that ended well before Ann made any sexual assault allegations. Furthermore, none of the text messages referred to Ann. The messages, at most, show that Melinda was upset with Myke, but they do not support Myke's preferred theory of defense that Melinda conspired with Ann to make sexual assault allegations against him.[11] Accordingly, the messages were not essential to Myke's defense.

¶42    Myke also had other reasonable means of defending his case. As noted, his counsel's strategy was to focus on Ann's inconsistencies and credibility. Brabazon extensively cross-examined Ann, focusing on the inconsistencies between what she reported to law enforcement, what she reported to the prosecutor, and what she testified to at trial. Moreover, Myke's counsel utilized other means of demonstrating Melinda's bias, as she testified about the custody and placement issue and admitted that she did not have a great relationship with

---

[11] At the *Machner* hearing, Myke testified that he wanted his defense to be that Melinda and Ann agreed to make the sexual assault allegations against Myke. Brabazon testified that Myke provided him with the text messages regarding child custody, including the payment of child support, and that Myke believed the allegations were fabricated because of the child custody issues. Brabazon added that he wanted to pursue the child custody issue as a theory of defense, but he could not do so because the circuit court excluded the messages from evidence.

Myke after they separated. In short, the exclusion of the text messages between Myke and Melinda did not leave Myke without any other reasonable means of defending his case. Therefore, the exclusion of the messages did not violate Myke's right to present a defense.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.